UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YANICK JACQUES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 13-10520-DJC |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE TO THE JOINT STATEMENT OF DEFENDANTS
UNITED STATES OF AMERICA AND CODMAN SQUARE HEALTH
CENTER, INC. OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE TO BE TRIED**

1.   The defendant Dr. Mark Beaumont received his medical degree in 2003. (Exhibit 1 (curriculum vitae of Mark Beaumont).) During his medical training he received minimal training on psychiatric care, consisting of common psychiatric diagnoses, treatment, and basic definitions. (Exhibit 2 (Beaumont2) at 122:17 – 123:2.) Before this litigation he did not know about the concepts of transference or counter-transference. (*Id*. at 123:8-21.) His views on transference and counter-transference were formed after the lawsuit was filed. (*Id*. at 192:7-19.) He began working at Codman in 2005 as a primary care provider in the Family Medicine group. (Exhibit 1 (CV of Mark Beaumont).)

**ADMITTED.**

2. According to the Codman medical record, the plaintiff Yanick Jacques received medical care at Codman from March 2005 through June 2011. (Exhibit 3 (Declaration of Cecilia Joseph) and Attachment A thereto.) The Plaintiff began receiving treatment from Dr. Beaumont in October 2007 as her primary care provider at Codman. (*Id*.)

**ADMITTED.**

3.   From the time of his first visit with Ms. Jacques in 2007, Dr. Beaumont believed that Ms. Jacques needed to be seen in Codman's Behavioral Health department because her psychiatric needs were beyond the scope of what he felt trained or comfortable providing. (Exhibit 2 (Beaumont) at 20:5-10.)

**ADMITTED.**

4. In January 2008, Dr. Beaumont referred Ms. Jacques to Codman's Behavioral Health unit for psychiatric counseling from a psychiatrist or counselor. (Exhibit 2 (Beaumont) at 16:4 – 16:18.) Ms. Jacques told Dr. Beaumont that she did not want to see anyone in the Behavioral Health unit, and that she only wanted to see Dr. Beaumont. (*Id*. at 20:5-21.) Dr. Beaumont told her he was

not comfortable with that. (*Id.*) She first received treatment in the Behavioral Health unit on August 18, 2008. (Exhibit 3 (Joseph Decl.), Attachment A.)

**ADMITTED.**

5.      During the period January 2008 through November 2008, Ms. Jacques saw Dr. Beaumont approximately twice a month. (Exhibit 3 (Joseph Decl.), Attachment A.)

**ADMITTED.**

6.      In many of the 2007 through 2008 visits, Dr. Beaumont provided Ms. Jacques some mental health counseling, in addition to addressing her physical complaints. (E.g., Exhibit 2 (Beaumont) at 13:6 – 14:7.) Dr. Beaumont has never been trained in psychiatry, so he gave her basic counseling that included advising her on deep breathing exercises; going for a walk; talking to a friend or family member as a way to manage her anxiety; and reviewing a checklist of questions regarding safety. (Id.; and id. at 110:21 – 112:2, 112:21 – 113:23.) He did not attempt psychotherapy. (Id. at 113:9-10.)

**DENIED.** First, the last sentence is a misrepresentation of Dr. Beaumont's testimony. Dr. Beaumont stated that he never attempted "psychoanalysis," which is very different from psychotherapy. Second, as discussed in more detail in Plaintiff's Statement below, defendant is minimizing the counseling Dr. Beaumont provided. He engaged in over a year of therapy with Ms. Jacques, including focusing on her severe history of sexual abuse and multiple suicide attempts. He diagnosed her with PTSD and Depression and wrote many prescriptions for psychiatric medication.

7.      Sometime in late 2008, Dr. Beaumont perceived that the nature of the patient-physician relationship was changing. (Exhibit 2 (Beaumont) at 29:20 – 32:16.) Dr. Beaumont felt that Ms. Jacques was non-compliant as a patient, and that she was expressing romantic feelings toward him. (Id.) Dr. Beaumont grew concerned about his ability to be Ms. Jacques's provider. (Id.)

**ADMITTED.**

8.      Dr. Beaumont had no romantic feelings toward Ms. Jacques at this time. (Exhibit 2 (Beaumont) at 31:24 – 32:25, 48:12-15, 73:13-17.) For that reason, he did not tell anyone that he had romantic feelings toward Ms. Jacques at this time. (Id. at 48:12-15, 73:13-17.)

**DENIED.** As described by plaintiff's expert, Jerry Blaine, MD, Dr. Beaumont was unaware of the feelings that developed between himself and Ms. Jacques during their therapy because he has not been trained about the phenomena of transference and countertransference, but the foundation for the boundary violations that later occurred were formed during the therapy. Exhibit 2, Affidavit of Jerry Blaine, MD, at Pages 1-2.

9.      On November 24, 2008, Ms. Jacques came to Codman asking to see Dr. Beaumont. (Exhibit 4 (medical records USCS00858, 855-856, 441).) She saw Carmen Cruz, her mental health counselor at Codman, and a counseling session ensued at which Ms. Jacques's

inappropriate feelings towards Dr. Beaumont and proper professional boundaries were discussed. (Exhibit 4 at USCS855.) Dr. Beaumont was present for a time. (Id.) Ms. Cruz and Dr. Beaumont informed Ms. Jacques that she would be transferred to another primary care provider. (Id.) Dr. Beaumont did not express any romantic feelings toward Ms. Jacques. (Exhibit 2 (Beaumont) at 48:8-15.) The medical record indicates that Dr. Beaumont discussed the matter with Dr. Severin, who was the Medical Director of Codman and Dr. Beaumont's supervisor. (Exhibit 4 at USCS00441.)

**ADMITTED.**

10. On or near November 24, 2008, Jo-Ann Winbush, Codman's then Manager for Patient Services, was also informed that Ms. Jacques should be transferred to another provider. (Exhibit 5 (Jacques) at 29:21-23.) Ms. Winbush scheduled Ms. Jacques to see another provider, Loretta Donald, Nurse Practitioner. (Exhibit 6 (Winbush) at 7:20 – 18:18, 27:6 – 28:4.)

**ADMITTED.**

11. From Ms. Jacques's first visit with Dr. Beaumont on October 19, 2007, to the date of the November 24, 2008, session, Ms. Jacques had at least 23 scheduled visits with Dr. Beaumont, over a 13-month period. (Exhibit 3 (Joseph Decl.), Attachment A.)

**ADMITTED.**

12. After the November 24, 2008 session, Dr. Beaumont did not see Ms. Jacques again until March 12, 2009, when Ms. Jacques came to Codman for an Urgent Care visit. (Exhibit 3 (Joseph Decl.), Attachment A.) An Urgent Care visit is when a patient arrives at the health center for an unscheduled "walk-in" visit. (Exhibit 2 (Beaumont) at 60:14-22.) The patient is brought in to an examination room, and the health care provider does not know who the patient is until the provider walks into the examination room. (Id. at 60:17 – 61:11) It was happenstance that Dr. Beaumont saw Ms. Jacques. (Id. at 61:12 – 62:10.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits.

13. At the March 12, 2009, Urgent Care visit, Dr. Beaumont did not express any romantic feelings towards Ms. Jacques. (Exhibit 2 (Beaumont) at 62:20 – 63:2.) He did not provide her any mental health counseling at that visit. (Id. at 121:13-24.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits.

14. Dr. Beaumont next saw Ms. Jacques on April 23, 2009. (Exhibit 3 (Joseph Decl.), Attachment A; Exhibit 2 (Beaumont) at 67:9-21.) Ms. Jacques had called the clinic and asked to be seen by Dr. Beaumont. (Exhibit 2 (Beaumont) at 67:22-25.) Dr. Beaumont did not have any

input into whether she would be allowed to see him. (Id. at 68:1-3.) He was surprised to see her, and he expressed his concern to his medical assistant. (Id. at 68:4 – 70:21.) Dr. Beaumont also expressed his concerns to Ms. Winbush and received reassurance that Ms. Jacques would be reassigned. (Id. at 70:25 – 71:11; and see Exhibit 6 (Winbush) at 52:11 – 57:6.) Dr. Beaumont agreed to see Ms. Jacques at that time, and he told Ms. Jacques that she would need to see a new primary care provider. (Exhibit 2 (Beaumont) at 70:25 – 71:20.) He did not provide her with any mental health counseling that day. (Id. at 122:3-8.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits.

15.     Up to the time of the April 23, 2009, office visit, Dr. Beaumont did not say anything to anyone at Codman that might have alerted them that he had romantic feelings towards Ms. Jacques, because he had no romantic feelings toward her. (Exhibit 2 (Beaumont) at 73:13-17.)

**DENIED.** Dr. Severin should have been alerted that Dr. Beaumont would have romantic feelings towards Ms. Jacques after Dr. Beaumont reported his concerns on or around November 24, 2008, and should have taken steps to make sure he did not treat Ms. Jacques any more and explained the concepts of Transference and Countertransference to Dr. Beaumont so that he understood that the feelings he developed towards Ms. Jacques flowed from the therapy and should not be acted upon. Exhibit 2, Affidavit of Jerry Blaine, MD, at Pages 2-3.

16.     After the April 23, 2009, office visit, Ms. Jacques saw other Codman providers for her care. Specifically, during the period between April 23, 2009, and May 27, 2010, Ms. Jacques had 12 visits with providers other than Dr. Beaumont in the Internal Medicine and Family Medicine departments at Codman. (Exhibit 3 (Joseph Decl.), Attachment A.) Her primary care provider was Dr. Connolly. (Exhibit 5 (Jacques) at 40:3 – 42:2.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits.

17.      After the April 23, 2009, office visit, Dr. Beaumont did not provide any medical treatment to Ms. Jacques until 13 months later, at an office visit on May 27, 2010. (Exhibit 2 (Beaumont) at 74:23 – 75:15.) He did speak to her by telephone between five and 10 times when she would call his pager to ask questions about the care that the residents were providing her. (Id. at 76:10 – 77:16.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits.

18.      During the period between the April 23, 2009, visit and the May 27, 2010, visit, Dr. Beaumont did not consider himself to be Ms. Jacques's doctor, and he made that clear to Ms. Jacques. (Exhibit 2 (Beaumont) at 77:21 – 78:22.)

**DENIED.**  As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations.  Dr. Beaumont told Ms. Jacques that he would not make a record of their visits.  In addition, Dr. Beaumont, or somebody else from Codman on his behalf, sent plaintiff a letter identifying Dr. Beaumont as her Primary Care Physician.

19.     Sometime in early 2010, probably February or March, Dr. Beaumont visited Ms. Jacques at her home, "to see how she was doing." (Exhibit 2 (Beaumont) at 80:12 – 81:7, 82:21 – 83:1.) Dr. Beaumont was having difficulties in his personal life. (Id. at 81:22 – 82:14.) He explained:

> A.   For a variety of reasons.  Um, you know, there was just a perfect, imperfect storm, if you will, of a variety of factors going on in my personal life, which coalesced and led to this time where, as I said, my judgment was altered.  I hadn't seen Ms. Jacques in over a year as a provider.  The last time I saw her was April of the prior year.  I truly didn't consider her my patient, and my understanding was, you know, after a significant amount of time passes, you know, an interaction like going to a patient's home –
>
> Q   Might be okay?
>
> A   -- would be okay.

(*Id*. at 81:9 – 81:19, *and see* 83:11-16.)

**ADMITTED.**

20.     Between early 2010 and the office visit of May 27, 2010, Dr. Beaumont visited Ms. Jacques at her home between five and ten times.  (Exhibit 2 (Beaumont) at 83:4-8.)

**ADMITTED.**

21.     During these visits, Dr. Beaumont did not provide Ms. Jacques any professional advice. (Exhibit 2 (Beaumont) at 84:21-23.) He characterized the progression of his visits with Ms. Jacques as follows:

> [O]ur initial interactions prior to our first sexual encounter in May 2010, many of those initial visits were, I would say, friendly, checking in with how she's doing, how she's feeling.  As the time progressed close to May, the visits became more personal, so not at all professional.

(Id. at 84:23 – 85:3.)

**ADMITTED.**

22.     When Dr. Beaumont visited Ms. Jacques at her home before they started having sexual relations, they talked about Dr. Beaumont, his marriage, his wife, his children, and sexual

experiences.  (Exhibit 5 (Jacques) at 47:25 – 48:19.)

**ADMITTED.**

23.     Two or three weeks before the May 27, 2010, office visit, Dr. Beaumont and Ms. Jacques had their first sexual encounter.  (Exhibit 2 (Beaumont) at 93:12-19; Exhibit 5 (Jacques) at 48:20 – 49:8.) Dr. Beaumont's purpose in having this encounter was purely personal. (Exhibit 2 (Beaumont) at 94:18-21.) They had sexual relations more than once in the weeks before the May 27, 2010, office visit.  (Id. at 84:1-13.) Each of these encounters occurred at Ms. Jacques's home, not at Codman. (Id. at 84:14-20; 93:12-21.)

**ADMITTED.**

24.     The May 27, 2010, office visit occurred because Ms. Jacques and Dr. Beaumont discussed contraception, and Dr. Beaumont said he could insert an IUD. (Exhibit 2 (Beaumont) at 85:12-25; Exhibit 5 (Jacques) at 49:22 – 50:10.)  Ms. Jacques understood that Dr. Beaumont was not her primary care physician at the time.  (Exhibit 5 (Jacques) at 50:11-17.) The office visit was scheduled, and Dr. Beaumont inserted the IUD.  (Exhibit 2 (Beaumont) at 86:3-12; 89:8-11.)  It was a purely professional office visit.  (Id. at 87:11-13.) Dr. Beaumont did not provide any mental health counseling.  (Id. at 88:17 – 89:4.)

**ADMITTED.**

25.     In May of 2010, Dr. Connolly was the plaintiff's primary care provider.  (Exhibit5 (Jacques) at 50:14-15.3)

**ADMITTED.**

26.     During the period June 2010 through August 2010, Dr. Beaumont and Ms. Jacques had sexual encounters approximately every week at Ms. Jacques's home.  (Exhibit 7, Answer No. 2.)  During this time they also had sexual relations once or twice at a park, and once in Dr. Beaumont's car (which was parked at Ms. Jacques's home).  (Exhibit 2 (Beaumont) at 94:22 – 95:20, 187:17 – 188:12; Exhibit 7, Answer No. 2.)

**ADMITTED.**

27.     Prior to August 2010, they did not have sexual relations at Codman.  (Exhibit 7, Answer No. 2; Exhibit 2 (Beaumont) at 94:22-17; see Exhibit 5 (Jacques) 56:1-10.)

**DENIED.**  As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations.  Dr. Beaumont told Ms. Jacques that he would not make a record of their visits.  Ms. Jacques does not recall when these relations occurred.

28.     Their first sexual encounter at Codman was in August 2010.  (Exhibit 2 (Beaumont) at 94:22 – 95:20.) This was unrelated to any medical visit with Dr. Beaumont.  (Id. at 96:8-19.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits. Ms. Jacques does not recall when these relations occurred.

29. For the period after approximately August 2010, there appears to be a dispute regarding the frequency and nature of sexual encounters that occurred in examination rooms at Codman.

**ADMITTED.**

30. In Answer to Interrogatory No. 2 propounded by the United States, Ms. Jacques claims, "We had sexual relations many times at Codman Square Medical Center, during medical visits. Dr. Beaumont would treat me and then we would have sexual relations in the exam room. This happened more than a dozen times over the course of almost a year." (Exhibit 8, Answer No. 2.)

**ADMITTED.**

31. When asked about these encounters, Ms. Jacques testified that she could not remember specifically when they occurred. (Exhibit 5 (Jacques) at 57:22 – 58:8.) She testified that they always occurred at the time of a medical appointment she had with Dr. Beaumont. (Id. at 58:22 – 59:2.) She testified that she would call Codman, speak to a secretary, and make an appointment to see Dr. Beaumont. (Id. at 59:3 – 62:22.)

**ADMITTED.**

32. Dr. Beaumont testified that they had just two sexual encounters at Codman, one in August 2010, and another in April 2011, and neither occurred in connection with medical care provided by Dr. Beaumont. (Exhibit 2 (Beaumont) at 94:22 – 97:5, 99:8-18; Exhibit 7, Answer No. 2.)

33. Dr. Beaumont also testified that from December 2008 until the April 5, 2011, office visit, he did not provide any mental health counseling to Ms. Jacques. (Exhibit 2 (Beaumont) at 122:9-16.)

**Plaintiff admits that defendant has accurately described Dr. Beaumont's testimony, but disputes the truth of the matter. Dr. Beaumont's own medical records clearly show that he provided regularly counseling through November 2008. See Plaintiff's Statement below at ¶¶ 12-29.**

34. The Codman medical record indicates that after the May 27, 2010, office visit (when Dr. Beaumont inserted an IUD), through the end of 2010, Ms. Jacques had one other medical appointment with Dr. Beaumont. (Exhibit 3 (Joseph Decl.) and Attachment A thereto.) This was an October 1, 2010, Urgent Care visit. (Id.; Exhibit 2 (Beaumont) at 101:6-21.) Dr. Beaumont had no role in making this appointment; he first learned she was there when he walked into the examination room. (Id.) He did not have sexual relations with the plaintiff during this visit. (See Exhibit 7, Answer No. 2; Exhibit 2 (Beaumont) at 184:7 – 186:25.) Ms. Jacques has no belief

whether sexual relations occurred during this visit. (Exhibit 5 (Jacques) at 75:15 –76:5.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits. Ms. Jacques does not recall when these relations occurred.

35.     According to the medical record, during the calendar year 2010, Ms. Jacques had 14 visits with other primary care providers in the Family Medicine department (not including two Urgent Care visits). (Exhibit 3 (Joseph Decl.), Attachment A.)

**ADMITTED.**

36.     During 2010, Dr. Beaumont did not consider Ms. Jacques to be his patient. (Exhibit 2 (Beaumont) at 101:2-5.)

**ADMITTED.**

37.     According to the Codman medical record, Ms. Jacques had three medical visits with Dr. Beaumont during 2011. (Exhibit 3 (Joseph Decl.), Attachment A.) The first, on February 3, 2011, was an Urgent Care visit that was converted to a regular visit. (Id.; Exhibit 2 (Beaumont) at 103:16 – 106:10.) Ms. Jacques was treated for dehydration with intravenous fluids, and her IUD was removed. (Id.) Dr. Beaumont and Ms. Jacques did not have sexual relations at the time of this visit. (Id. at 106:3-7; Exhibit 5 (Jacques) at 76:11 – 78:20.) According to Ms. Jacques, they did have sexual relations at her house afterwards. (Exhibit 5 (Jacques) at 78:18 – 79:1.)

**DENIED.** As explained below (See Plaintiff's Statement at ¶ 47) Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits. Ms. Jacques does not recall when these relations occurred.

38.     According to the Codman medical record, the plaintiff's last two medical visits with Dr. Beaumont were on April 5, 2011, and April 14, 2011. (Exhibit 3 (Joseph Decl.), Attachment A.) Dr. Beaumont believes he provided Ms. Jacques with some basic mental health counseling during these visits. (Exhibit 2 (Beaumont) at 108:8 – 112:9, 116:20 – 117:1.) According to Dr. Beaumont, they did not have sexual relations during these visits. (See id. at 109:14-16, 184:7 – 186:25; Exhibit 7, Answer No. 2.) Ms. Jacques does not remember these visits. (Exhibit 5 (Jacques) at 79:2 – 81:4.)

**ADMITTED.**

39.     At no time during May 2010 through April 2011 did Dr. Beaumont consider Ms. Jacques to be a patient of his. (Exhibit 2 (Beaumont) at 101:2-5.) He did not consider himself to be Ms. Jacques's primary care provider. (Id. at 107:2 -15.)

**ADMITTED.**

40.     In March or April 2011, Dr. Beaumont and Ms. Jacques had sexual relations at a hotel. (Exhibit 2 (Beaumont) at 187:1-16.) Ms. Jacques paid for the hotel room and Dr. Beaumont reimbursed her. (Id.)

**ADMITTED.**

41.     Dr. Beaumont and Ms. Jacques had one or two sexual encounters in May 2011 that occurred at Boston Medical Center. (Exhibit 2 (Beaumont) at 99:23 – 101:1; Exhibit 5 (Jacques) at 69:9-14.) These were unconnected to the provision of any medical care by Dr. Beaumont at that time. (Exhibit 2 (Beaumont) at 100:16-20; Exhibit 5 (Jacques) at 69:9-25.) The encounter at Boston Medical Center (or the second one, if there were two) was the last sexual encounter they had, and it resulted in Ms. Jacques getting pregnant. (Exhibit 2 (Beaumont) 100:21 – 101:1; Exhibit 5 (Jacques) at 69:19, 70:8-10.)

**ADMITTED.**

42.     During 2010, Dr. Beaumont gave several gifts and cards to Ms. Jacques. (Exhibit 2 (Beaumont) at 55:17 – 60:4, and errata sheet.4) Each was delivered to Ms. Jacques at her home. (Id. at 59:21 – 60:4.)

**ADMITTED.**

43.     Dr. Beaumont testified that having an intimate or sexual relationship with a patient is absolutely not part and parcel of his job duties and responsibilities as a physician at Codman Square. (Exhibit 2 (Beaumont) at 191:18 – 191:23.)

**ADMITTED.**

44.     Dr. Beaumont agrees that his intimate relationship with the plaintiff was outside the scope of his medical treatment duties for the plaintiff. (Exhibit 2 (Beaumont) at 191:25 – 192:4.)

**ADMITTED.**

45.     Dr. Beaumont did not delete any Codman medical records from the Codman electronic medical record system. (Exhibit 9 (Declaration of Danny MacNeil) ¶ 5.) It was impossible for him to do so. (Id. ¶ 4.)

**ADMITTED.**

46.     Dr. Philip Severin, the medical director at Codman and Dr. Beaumont's supervisor, had no knowledge or suspicion that Dr. Beaumont had any romantic feelings towards Ms. Jacques or that he might engage in a sexual relationship with her. (Exhibit 10 (Declaration of Philip Severin, MD).) He first learned of the sexual relationship in June 2011 when the Massachusetts Board of Registration in Medicine ("BORM") requested information from Codman. (Id.)

**DENIED.** Dr. Severin should have been alerted that Dr. Beaumont would have romantic feelings towards Ms. Jacques after Dr. Beaumont reported his concerns on or around November 24, 2008, and should have taken steps to make sure he did not treat Ms. Jacques any more and explained the concepts of Transference and Countertransference to Dr. Beaumont so that he understood that the feelings he developed towards Ms. Jacques flowed from the therapy and should not be acted upon. Exhibit 2, Affidavit of Jerry Blaine, MD, at Pages 2-3.

47. While the medical record indicates Dr. Severin was made aware of the boundary-crossing behavior of the plaintiff (Exhibit 4 at USCS0441), there is no evidence to suggest Dr. Severin had any reason to suspect that Dr. Beaumont might cross professional boundaries by engaging in a sexual relationship with Ms. Jacques. (Exhibit 10 (Severin Decl.).)

**DENIED.** Dr. Severin should have been alerted that Dr. Beaumont would have romantic feelings towards Ms. Jacques after Dr. Beaumont reported his concerns on or around November 24, 2008, and should have taken steps to make sure he did not treat Ms. Jacques any more and explained the concepts of Transference and Countertransference to Dr. Beaumont so that he understood that the feelings he developed towards Ms. Jacques flowed from the therapy and should not be acted upon. Exhibit 2, Affidavit of Jerry Blaine, MD, at Pages 2-3.

48. Jo-Ann Winbush first learned of the sexual relationship when the Massachusetts BORM was conducting its investigation. (Exhibit 11 (Declaration of Jo-Ann Winbush).) Before hen, she had no knowledge or suspicion that Dr. Beaumont had any romantic feelings towards Ms. Jacques or that he might engage in a sexual relationship with Ms. Jacques. (Id.)

**ADMITTTED.**

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

I. PLAINTIFF'S ALLEGATIONS IN THIS MATTER

1. The gravamen of plaintiff's claims against Dr. Beaumont are that he attempted to provide counseling that he was not qualified to perform, continued to provide counseling after he knew it would be better for Ms. Jacques to see a behavioral health specialist, and failed to recognize the phenomena of Transference and Countertransference that caused intense feelings between Ms. Jacques and himself. She also claims that Dr. Beaumont engaged in improper sexual boundary violations. See Complaint at Paragraph 22, Exhibit 1, and the Affidavit of plaintiff's expert, Jerry Blaine, MD, Exhibit 2.

2. In the paragraph describing her claims against Dr. Beaumont in her Complaint plaintiff states:

> In providing counseling, care, treatment, and advice, and engaging in other conduct constituting boundary violations, the defendant, Dr. Beaumont was negligent in failing to exercise that degree of skill, care, and diligence that is exercised by the

average qualified practitioner engaged in practice at a professional level such as that in which the defendant was then engaged.

See Complaint, Exhibit 1 at Paragraph 22.

3. Plaintiff has further disclosed her theories through the disclosure of her expert, Jerry Blaine, MD, an experienced primary care physician who has worked extensively in administrative roles throughout his distinguished 38-year career. See Blaine Affidavit, Exhibit 2, at Page 1.

4. Briefly, as described in more detail below, Dr. Blaine explains that Ms. Jacques had a very complicated psychiatric history stemming from sexual assault and rape when she was a child, resulting in psychiatric sequelae that Dr. Beaumont was unqualified to treat. Dr. Beaumont's attempt to provide counseling to a patient like Ms. Jacques was a departure from the standard of care, as was his failure to insist that she get help from a behavioral health specialist. Id.

5. Dr. Blaine also explains that Dr. Severin departed from the standard of care in failing to supervise Dr. Beaumont about the importance of insisting that Ms. Jacques see a behavioral health specialist and the importance of not treating Ms. Jacques any more. Id. Page 2.

6. Dr. Blaine also explains that Dr. Severin and Ms. Winbush departed from the standard of care when they failed to take steps to prevent further contact between Dr. Beaumont and Ms. Jacques. Id. Pages 2-3.

7. Finally, Dr. Blaine explains that it was foreseeable that after the defendants failed to take steps to protect her that Ms. Jacques would engage in a harmful sexual relationship with Dr. Beaumont. Id., Pages 3-4.

II.   FACTUAL BACKGROUND

   A.   Yanick Jacques' Psychiatric History

8. Yanick Jacques has a long history of mental illness as a result of sexual assault and rape as a child and a teenager. She has suffered serious symptoms of post traumatic stress disorder (PTSD) including suicidality and anxiety attacks. Plaintiff's Answers to Interrogatories, Exhibit 3 at No. 2; Medical Records produced by Defendants, Exhibit 4 at 315.

   B.   Treatment with Dr. Beaumont

9. Dr. Beaumont, a family care practitioner, first treated Ms. Jacques on October 19, 2007, during which time he noted a psychiatric history that included anxiety disorder and insomnia. See Medical Records Produced by Defendants, Exhibit 4 at Pages 249-251.

10.     Dr. Beaumont continued to treat Ms. Jacques for medical and psychiatric issues over the next several months, and prescribed her psychiatric medication including Prozac and Ativan. Id. at 258-260, 267-269.

11.     At a visit on January 18, 2008 Dr. Beaumont attempted to refer Ms. Jacques to the Behavioral Health Department (BH) at Codman Square for psychotherapy with a Therapist. Id. at 269, 271.

12.     Ms. Jacques did not go to the Behavioral Health Department, and instead began ongoing counseling with Dr. Beaumont. She started to reveal sensitive information about her symptoms to him at her next visit on January 25, 2008, including that she engaged in cutting behavior and had a history of suicide attempts including jumping out of a window. She told Dr. Beaumont that she did not want to see anybody in Behavioral Health, and only wanted to see him. He told her that he was uncomfortable with that but continued to provide counseling to her, knowing that she did not go to Behavioral health. Dr. Beaumont noted that the reason for the visit was "anxiety disorder" and again referred her to Behavioral Health (BH), but also scheduled a follow up with him in 1 week. He noted that she suffered from Depression, anxiety and PTSD, but did not record what the trauma was. He continued to prescribe psychiatric medication. Id. at 273-275; Deposition of Dr. Beaumont, Exhibit 5, at Page 20, Lines 5-21)

13.     Ms. Jacques did not go to Behavioral Health, but did return to Dr. Beaumont a week later, on February 4, 2008. She again discussed her psychiatric issues with Dr. Beaumont, who inquired about her suicidal ideation (SI), which she denied. Dr. Beaumont again listed the reason for this visit as follow up for her "anxiety disorder" and continued to note that she suffered from anxiety, depression and PTSD. Dr. Beaumont noted that he "Reviewed relaxation techniques" with Ms. Jacques. He scheduled her to return in 1 week for follow up, although he continued to list "BH referral" as part of his plan. He continued to prescribe psychiatric medication. See Medical Records Produced by Defendants, Exhibit 4 at 290-292.

14.     Ms. Jacques returned to Dr. Beaumont on February 28, 2008. Dr. Beaumont again identified the reason for the visit as "anxiety disorder," although he continued to note that she also suffered from Depression and PTSD, without a description of what her trauma was. At this visit Dr. Beaumont noted that he spent 20 minutes counseling Ms. Jacques and noted that they again reviewed relaxation techniques. He again scheduled her to return in 1 week for follow up, although he continued to list "BH referral" as part of his plan. Id. at pages 296-298.

15.     Dr. Beaumont continued to counsel Ms. Jacques for her "anxiety disorder" over the next several months. At these visits he continued to list her problems as Anxiety, Depression and PTSD. He would provide her with 20 minutes of counseling at each visit and they continued to discuss relaxation techniques. He would assess her for suicidal ideation (SI). He continued to note that he referred her to Behavioral Health (BH) although he did not make any formal referrals as he had earlier. He continued to prescribe psychiatric medication. Id. 300-302, 306-308, 314-317.

16. At an April 3, 2008 counseling session with Dr. Beaumont Ms. Jacques revealed to him that she had a history of sexual abuse and rape, and told him that old memories often affect her current relationships. Id. at 315.

17. Although he continued to list "BH referral" in his plan, Dr. Beaumont did not make any formal referrals to Behavioral Health as he did on January 18, 2008. Id.

18. Ms. Jacques saw Dr. Beaumont again 4 days later for further counseling about her sexual abuse and problems with her current relationships. Dr. Beaumont continued to recommend relaxation techniques and continued to list "BH referral" as part of the plan, but failed to make a formal referral. Id. at 319-321.

19. Ms. Jacques continued to see Dr. Beaumont regularly for counseling. He continued to recommend relaxation techniques and continued to list "BH referral" as part of the plan, but failed to make a formal referral. He continued to prescribe psychiatric medication. Id. at 323-326, 331-334, 338-341, 349-351.

20. At a counseling session on June 12, 2008 Ms. Jacques told Dr. Beaumont that she had recently had suicidal ideation. On this occasion Dr. Beaumont did make a formal referral to Behavioral Health, for the second time since he had started to counsel Ms. Jacques. Again he requested that Ms. Jacques be treated by a qualified Therapist. Id. at 349-351, 354

21. Ms. Jacques did not go to Behavioral Health. She had counseling with Dr. Beaumont again on June 30, 2008 and again discussed Suicidal Ideation (SI) with him. Although he continued to list a referral to Behavioral Health as part of his plan, he did not make a formal referral or insist that Ms. Jacques get therapy from a qualified therapist. He continued to prescribe psychiatric medication. Id. at 356-358.

22. After many months of counseling from Dr. Beaumont related to serious psychiatric issues including a severe sexual trauma history and suicidal ideation, Ms. Jacques suffered a psychiatric crisis on August 9, 2008 and was admitted to the inpatient psychiatric unit at Carney Hospital. Immediately before she was admitted she called Dr. Beaumont but was unable to reach him. After discharge she returned to counseling with Dr. Beaumont starting on August 18, 2008. She told him that she was at her "lowest point," that "my life is over," and discussed recent suicidal ideation. Dr. Beaumont had Ms. Jacques enter into a "contract for safety" and again encouraged relaxation techniques, and encouraged her to get "better supports." This time Dr. Beaumont requested an "Emergency BH referral," but also asked her to follow up with him in two weeks. Id. 372-376.

23. This time Ms. Jacques did go to Behavioral Health, but she also continued to attend regular counseling sessions with Dr. Beaumont as well. In a counseling session on September 10, 2008 she told him she had experienced suicidal ideation and had put a rope around her neck to hang herself but did not go through with it. Dr. Beaumont's plan was for to continue with relaxation techniques, and he again encouraged "better supports." Id. at 389, 394-6.

24.     It should be noted that Dr. Beaumont did not make an official note in Ms. Jacques chart each time he saw her, which explains why there are relatively few notes even though Ms. Jacques saw Dr. Beaumont up to 2-3 times per week for counseling and considered him her therapist.  Dr. Beaumont told Ms. Jacques that he did not make a note each time he saw her.  Id. at 858; Deposition of Yanick Jacques, Exhibit 6, Page 43, Line 16 – 25.

25.     Ms. Jacques had another documented counseling session with Dr. Beaumont on September 17, 2008, during which she discussed her abuse as a child and how she would often get upset trying to remember who was the perpetrator.  By this time Dr. Beaumont had added "PTSD" in addition to "anxiety disorder" as the reason for the visit.  Dr. Beaumont again had Ms. Jacques enter into a "contract for safety," encouraged relaxation techniques, and encouraged her to get "better supports."  See Medical Records Produced by Defendants, Exhibit 4 at 399-401.

26.     Ms. Jacques had another counseling session with Dr. Beaumont on September 24, 2008.  Dr. Beaumont's plan remained the same.  He again had Ms. Jacques enter into a "contract for safety," encouraged relaxation techniques, and encouraged her to get "better supports."  He continued to prescribe psychiatric medication.  Id. at 404-406.

27.     Ms. Jacques had another counseling session with Dr. Beaumont on October 3, 2008.  The reason for the office visit was depression and anxiety.  Dr. Beaumont's plan remained the same.  He again had Ms. Jacques enter into a "contract for safety," encouraged relaxation techniques, and encouraged her to get "better supports."  Id. at 410-412

28.     Ms. Jacques had further 20-minute counseling sessions with Dr. Beaumont on October 22, 2008, October 30, 2008.  Dr. Beaumont's plan remained the same.  He again had Ms. Jacques enter into a "contract for safety," encouraged relaxation techniques, and encouraged her to get "better supports."  Id. at 415-417, 420-422.

29.     Ms. Jacques saw Dr. Beaumont again on November 18, 2008 for a 20-minute counseling session.  She told Dr. Beaumont that she was worried that "I may lose it again."  She was unable to go to her job because she was too anxious.  Dr. Beaumont's plan remained the same, he again had Ms. Jacques enter into a "contract for safety," encouraged relaxation techniques, and encouraged her to get "better supports."  Id. 433-435.

30.     Two days later, on November 20, 2008 Ms. Jacques "walked in" to Dr. Beaumont's office reporting increased anxiety and suicidal ideation.  She told him that she was not capable of caring for her children under her condition and was considering getting DSS involved.  Dr. Beaumont spent 20 minutes counseling her and noted her to be tearful and withdrawn, with a flat affect.  Id. at 436-438.

31.     By November 24, 2008, after a more than a year, Dr. Beaumont finally realized that he should not be counseling Ms. Jacques and that she needed to be seen by another provider.  He noted that Ms. Jacques had "often" crossed boundaries during their counseling, had come to the clinic without an appointment and had talked to him in public places outside of the office.  He noted that she had a long history of troubled relationships, a history of sexual assault and rape

resulting in PTSD and an anxiety disorder, and that she had a history of attachment problems, often feeling betrayed by men. Id. at 441.

### C. The "Transfer" of Care

32. Dr. Beaumont met with defendants JoAnn Winbush and Philip Severin, MD, told them that Ms. Jacques had crossed boundaries with him, that she had romantic feelings towards him, that she has a long history of attachment problems with men, a history of troubled relationships, and a history of molestation and rape. He asked them to transfer Ms. Jacques to another provider. He was assured that she would be. Dr. Beaumont testified that:

> "Joanne Winbush made it explicitly clear that the patient would be transferred and that I wouldn't see her again, and that's something she would work with Dr. Severin and Carmen Cruz about."

Id. at 441; Exhibit 7, Mark Beaumont, MD's Answers to Plaintiff's Interrogatories, No. 9; Deposition of Dr. Beaumont, Exhibit 5, at Page 36, Lines 16-22.

33. Dr. Severin does not recall speaking with Dr. Beaumont and Ms. Winbush about Ms. Jacques. But under similar circumstances he would expect that an administrator would reassign the patient to another provider, follow up to make sure that the patient saw the new provider, and put a flag in the scheduling system so that the patient did not see the doctor anymore. Exhibit 8, Deposition of Philip Severin, MD, Vol. I, Page 82, Line 18 – Page 83, Line 23.

34. The current scheduling system at Codman Square has "pop-up" alerts that allow staff to enter information about a patient that will pop-up on the computer screen when a scheduler is scheduling a patient for an appointment, and when a nursing assistant is preparing a patient to be seen by a physician. Codman Square did not implement this feature until 2010 although it was available to them earlier than this. This system could be used by staff to alert schedulers that specific patients should not be seen by specific doctors. Before the pop-up system was implemented in 2010 staff could put comments in a patient's electronic record, which schedulers would review when scheduling a patient, but the comments did not pop-up so staff would have to look for the comments. Under the old system it was more likely that staff comments would be missed by schedulers. See Deposition of Codman Square Pursuant to Rule 30(b)(6), Exhibit 9, at pages 18-22, 47.

35. In 2008 Codman relied on oral communication to inform schedulers that a specific patient should not be seen by a specific doctor, and admits that it is unlikely that schedulers would remember this information. Id. at pages 29-30.

36. Other than the scheduling system, initially with comments that did not pop-up and later with alerts that did, Codman Square relied upon oral communication to schedulers, nurses and nursing assistants to alert them that a specific patient should not be seen by a specific doctor. Codman Square uses incident reports, but does not have a policy that requires an incident report be created when a decision has been made that a patient should not be seen by a

specific doctor. So sometimes when a determination has been made that a patient should not see a specific doctor an incident form is created and distributed to staff, and other times this is not done. Codman Square did not use electronic mail, memos or other written communication to inform staff. Instead, management would simply orally tell each and every member of their staff to avoid scheduling a patient with a specific doctor. However, Codman Square acknowledges that it would be "challenging" for each scheduler to remember that they had been told not to schedule specific patients with specific doctors. The manager who made the decision that the patient should not see the doctor is responsible for creating a communication plan to let other managers know to tell their staff not to let the patient see the doctor. The same manager is responsible for following up to make sure this has been done. Id., at pages 22-29.

37. Codman Square expected its unit secretaries, medical assistants and nursing staff to look in the comments section each time they scheduled a patient, to see, among other things, whether there was a comment indicating that the patient should not be scheduled with a specific doctor. Id., at pages 40-41.

38. Pursuant to Codman Square's own policy Jo Ann Winbush should have made sure that the schedulers and the nursing assistants who worked with Dr. Beaumont knew that Ms. Jacques should not be scheduled with Dr. Beaumont. Id., at pages 45-46.

39. In violation of this policy Jo Ann Winbush did speak with schedulers to tell them that Ms. Jacques should not be seen by Dr. Beaumont. Instead she simply claims she told Ms. Jacques not to see Dr. Beaumont anymore, to instead to see a Nurse Practitioner named Loretta Donald. But according to Ms. Winbush, if Ms. Jacques scheduled an appointment with Dr. Beaumont again, she would be treated by Dr. Beaumont pursuant to Codman Square Policy. Exhibit 10, Deposition of Jo Ann Winbush at Page 26, Line 10 – Page 30, Line 10.

40. Despite the assurances that Ms. Jacques would not be treated by Dr. Beaumont again, she saw him again Codman Square for numerous medical visits, beginning on March 12, 2009. Exhibit 4 at 445-448;

41. More than six months after Ms. Winbush had assured Dr. Beaumont that Ms. Jacques would be transferred to another Primary Care Physician (PCP) Codman still identified him as her PCP. Exhibit 4 at 457.

**D.   Dr. Beaumont's Qualifications and Responsibilities**

42. Dr. Beaumont knew, from Ms. Jacques' first visit that she needed psychiatric treatment from the Behavioral Health department because her psychiatric needs were beyond what he was trained to provide. Deposition of Dr. Beaumont, Exhibit 5, at Page 20, Lines 5-10; Page 138, Line 21 – Page 139, Line 6.

43. Dr. Beaumont did not understand the concepts of Transference and Countertransference until after the Board of Registration in Medicine prosecuted him for his conduct with respect to Ms. Jacques. See Deposition of Dr. Beaumont, Exhibit 5, at Page 122, Line 17 – Page 123, line 2.

44.     Dr. Severin testified that he did not provide training to Dr. Beaumont about these concepts as a resident or as a junior physician. Exhibit 8, Deposition of Dr. Severin, Vol. I, Page 58, Line 1 – Page 61, Line 14.

45.     Dr. Severin generally considered counseling a patient like Ms. Jacques to be within the scope of Dr. Beaumont's responsibilities as a family physician at Codman Square Health Center. See Deposition of Dr. Severin, Volume II, Exhibit 11, at Pages 25-28.

46.     Codman Square Health Center had a Behavioral Health Department and Dr. Severin expected Dr. Beaumont to assess whether he was competent to provide counseling to Ms. Jacques or whether she should be referred to Behavioral Health. Id.

**E.     Boundary Violations**

47.     Dr. Beaumont engaged in sexual relations with Ms. Jacques in numerous locations, including at least a dozen times at Codman Square Health Center, including in examination rooms before or after medical treatment by Dr. Beaumont. Dr. Beaumont would have Ms. Jacques would call Codman Square Health Center, speak with a secretary and make an appointment to see him and they would have sexual relations. Exhibit 3, Plaintiff's Answers to United States' Interrogatories, No. 2; , Exhibit 6, Deposition of Yanick Jacques, Pages 57-62.

48.     It was unethical for Dr. Beaumont to engage in sexual relations with Ms. Jacques and the Board of Registration in Medicine revoked his medical license for this conduct. Exhibit 12, Consent Order.

49.     As a result of Dr. Beaumont's boundary violations Ms. Jacques suffered and continues to suffer significant emotional and physical harm, including suicidality. She continues to treat for these injuries with a therapist at Carney Hospital. Exhibit 3, Plaintiff's Answers to United States' Interrogatories, at Nos. 6 and 7.

50.     All of the sexual relations between Ms. Jacques and Dr. Beaumont took place after Dr. Beaumont had been assured by JoAnn Winbush that she would not be scheduled to see him again. Deposition of Dr. Beaumont, Exhibit 5, at Page 93.

51.     Neither Dr. Beaumont nor Dr. Severin blame the plaintiff for the sexual relationship between her and Dr. Beaumont. Exhibit 5, Page 137, Lines 7-9; Exhibit 11, Page 8, Lines 2-4.

52.     In June 2011 after the Board of Registration in Medicine began investigating Dr. Beaumont he spoke with Dr. Severin and told him about his sexual relationship with Ms. Jacques. Exhibit 12, Dr. Beaumont's Answers to Interrogatories, No. 9.

53.     Even after he learned of Dr. Beaumont's unethical conduct and that Dr. Beaumont was being prosecuted by the Board of Registration in Medicine, Dr. Severin never reached out to Ms. Jacques to help her or to apologize for what happened to her at his clinic. Deposition of Philip Severin, MD, Vol. I, Exhibit 8, Page 103, Line 18 – Page 104, Line 8.

54.     Instead, on August 29, 2011 he wrote a letter to the Board of Registration in Medicine supporting Dr. Beaumont and promising to support him if the Board allowed him to return to practice.  Exhibit 13, Severin Letter Produced by Defendants and marked as Deposition Exhibit.

III.    DEFENDANTS' DEPARTURES FROM THE STANDARD OF CARE

55.     Plaintiff's expert, Jerry Blaine, MD, is an experienced primary care physician who has worked extensively in administrative roles throughout his distinguished 38-year career.  He has reviewed the medical records, relevant discovery responses, and deposition transcripts in this matter, and offered his opinions in an Affidavit.  Exhibit 2, Page 1.

56.     Dr. Blaine testifies in his Affidavit that Dr. Beaumont was not qualified to provide counseling to a patient with Ms. Jacques' symptoms.  His continuing to do so under the circumstances was a departure from the standard of care to be expected of the average qualified family physician at the time (hereinafter the "standard of care"). He was clearly outside of his level of expertise.  Patients with Ms. Jacques' trauma history require treatment by experienced mental health practitioners.  Among other things, Dr. Beaumont was not trained or qualified to handle issues of transference and counter transference.  Anyone counseling a patient such as Ms. Jacques needs to be adequately trained in the strong feelings that often develop between patient and therapist (transference) including feeling of sexual attraction that can never be acted upon.  Having these feelings and understanding where they come from in the safety of the therapy is in fact part of the therapy.  Likewise, trained counselors are trained to anticipate strong feeling that can develop in them for the patient (counter-transference) that likewise need to be understood as part of the therapy and again can never be acted upon.  The foundation for the boundary violations that later occurred were put in place when Dr. Beaumont continued to provide counseling (therapy) for Ms. Jacques.  Exhibit 2, Pages 1-2.

57.     Based on the medical records Dr. Beaumont he was clearly providing therapy to Ms. Jacques.  Exhibit 2, Page 2.

58.     Given that he was unaware of the processes of transference and countertransference, and received no training on this from Dr. Severin, his Medical Director, it was not surprising that Dr. Beaumont failed to appreciate the feelings Ms. Jacques quickly developed for him.  Exhibit 2, Page 2.

59.     Consistent with the standard of care and given the supervisory responsibility that Dr. Severin had with respect to Dr. Beaumont and his department he should have been aware of the concepts of transference and countertransference and he also should have referred Dr. Beaumont to an appropriate person for additional training to understand the concepts of transference and countertransference when treating his patients.  Exhibit 2, Page 2.

60.     In addition, in accordance with the standard of care Dr. Severin should have taken steps to alert staff at Codman Square Health Center that Dr. Beaumont should not treat or see Ms. Jacques and to put in place systems to assist in making sure that Dr. Beaumont not see Ms. Jacques at the Center.  As the Medical Director with supervisory responsibility for this situation, having been alerted to the strong feelings that Ms. Jacques had developed for Dr. Beaumont he also had a duty pursuant to the standard of care to put in place a system to provide that he be

alerted if there were any future attempts by the patient to see Dr. Beaumont at the Heath Center. No such system was put in place. There are numerous electronic medical systems that could be used to provide for such alerts. Dr. Severin instructed Administrator Jo Ann Winbush to find Ms. Jacques a new physician, but did nothing further to follow up to make sure that there was an adequate system in place so that Ms. Jacques was not seen by Dr. Beaumont again. It should have been anticipated that Ms. Jacques, given her strong feelings for Dr. Beaumont would persist in trying to see Dr. Beaumont. Given his limited training and experience in these circumstances any further contact would foreseeably place her at great risk of boundary violations. Exhibit 2, Pages 2-3.

61. Ms. Winbush also shares responsibility in her administrative position for failing to take adequate steps to prevent future contact at the Center between Ms. Jacques and Dr. Beaumont. During the time Ms. Jacques treated with Dr. Beaumont, Codman Square had a scheduling system that allowed notes to be entered for patients, that schedulers might review before scheduling the patient, but might not. As an administrator, Ms. Winbush was aware of this. Notwithstanding this, she failed to take adequate steps, in accordance with the standard of care applicable to her in her administrative position, to ensure that staff responsible for scheduling Ms. Jacques, and for meeting with her before she was seen by Dr. Beaumont, were aware that she should not be seen by him. Among other things, she failed to send any formal memo or email to all staff responsible for scheduling patients, and to the nursing assistants who worked with Dr. Beaumont, instructing them that Dr. Beaumont was not to see Ms. Jacques. Exhibit 2, Page 3.

62. Ms. Winbush also failed to instruct staff that if Dr. Beaumont did in fact treat Ms. Jacques that they needed to report this to her or another administrator and to Dr. Severin. This was a departure from the standard of care. As stated above, Dr. Beaumont had reported to Dr. Severin and Ms. Winbush that Ms. Jacques was infatuated with him, was seeing him outside of the office, was showing up at his church in a way that caused him concern, and believed that she should only be treated by him and nobody else. Id.

63. Given her history, Ms. Jacques infatuation with Dr. Beaumont created a foreseeable risk of boundary violations in any further meetings. Dr. Severin and Ms. Winbush had a duty, in accord with the standard of care, to prevent her from being treated by or in fact seen by him at Codman Square ever again. Id.

64. Dr. Severin departed from the standard of care when he delegated the task of ensuring that Ms. Jacques not be treated by Dr. Beaumont to Ms. Winbush and took no further steps to make sure an acceptable system was in place to prevent such future contact and provide notification to him if attempts were made for further contact. As Medical Director he knew, or in accordance with the standard of care should have known, that the systems and processes in place (as described above) were inadequate to prevent Ms. Jacques from being treated by Dr. Beaumont in the future. He also departed from the standard of care in failing to instruct Ms. Winbush to put a process in place so that he would be notified if Dr. Beaumont ever treated Ms. Jacques again. Id.

65.     Not surprisingly, after the patient was permitted to see Dr. Beaumont at the Center, the strong feelings already present in Ms. Jacques, which clearly became reciprocated by Dr. Beaumont, overwhelmed them and the predictable boundary violations began with devastating results.  After a pregnancy and great emotional distress that was all sadly foreseeable, Ms. Jacques was devastated and became suicidal.  She has suffered and continues to suffer significant emotional and physical injuries as a result of the defendants' conduct.  Id.

66.     Had Dr. Severin and/or Jo Ann Winbush acted appropriately and in accordance with the standard of care when Dr. Beaumont first brought to their attention the very strong feelings of attraction to him that had developed in Ms. Jacques and her apparent inability to control them on her own, it is likely that the boundary violations that occurred thereafter would have been avoided. Id.

                                                  Respectfully Submitted by the Plaintiff,
                                                By her attorneys:

Date: June 19, 2014

                                                /Scott M. Heidorn
                                                Clyde D. Bergstresser, BBO #039200
                                                Scott M. Heidorn, BBO# 661787
                                                Bergstresser & Pollock LLC
                                                52 Temple Place
                                                Boston, MA 02111
                                                (617) 682-9211
                                                (617) 451-1070
                                                Clyde@bergstresser.com
                                                Scott@bergstresser.com

## CERTIFICATE OF SERVICE

     I, Scott Heidorn, hereby certify that I served this document on all parties of record via ECF on June 19, 2014.

                                                /Scott M. Heidorn