I am a board-certified in internal medicine since 1976.  I practiced as a Senior Internist in the Department of Internal Medicine at Lahey Clinic from 1977 until 2013.  During this time I served as the Section Head of General Internal Medicine and served on the Peer Review Committee.  In that capacity I am familiar with the standard of care for administrators and Medical Directors of an Internal Medicine or Family Practice.  I have also been a member of the Section of Medical Ethics, from 1991-2013.  I have also served on the Medical Record Committee and the Information Technology Master Planning Committee, during which I helped make decisions related to systems used by the primary care service at Lahey Clinic.  I have been a Clinical Instructor in Medicine at Harvard Medical School from 1978 to present, was a Preceptor for the Harvard Medical School Patient Doctor III Course from 1992 through 2006, and a Preceptor for the Harvard Medical School Primary Care Course from 1997 through 2005.

I have worked closely with and instructed internal medicine and family practice physicians and administrators of family practice and internal medicine departments for decades, and I am familiar with the standard of care required of family medicine physicians, Directors of Medicine, and administrators of family practice and internal medicine departments under the circumstances of this case.

I have reviewed the various pleadings, discovery responses, depositions with exhibits, medical records and records from the Board of Registration in Medicine. All of my opinions in this Affidavit are held to a reasonable degree of medical certainty.

Briefly, Yanick Jacques has a long history of mental illness stemming from significant trauma including sexual assault and rape as a child and a teenager.  She has suffered serious symptoms of post traumatic stress disorder (PTSD) including suicidality.  She began treating with Mark Beaumont, MD, a family medicine practitioner at Codman Square Health Center in 2007.  Dr. Beaumont quickly determined that Ms. Jacques was suffering severe symptoms of PTSD and, notwithstanding the fact that he has no special training in being a therapist, began counseling her on a semi-regular basis.  It seems that he quickly became concerned that her symptoms were more severe than he was qualified to treat, and he suggested she treat with a behavioral health provider.  However, she did not agree to see anybody in the Behavioral Health Department and he nevertheless continued to provide counseling to her for over one year.

Dr. Beaumont was not qualified to provide counseling to a patient with Ms. Jacques' symptoms.  His continuing to do so under these circumstances was a departure from the standard of care to be expected of the average qualified family physician at the time (hereinafter the "standard of care"). He was clearly outside of his level of expertise. Patients with Ms. Jacques' trauma history require treatment by experienced mental health practitioners.  Among other things, Dr. Beaumont was not trained or qualified to handle issues of transference and counter transference.  Anyone counseling a patient such as Ms. Jacques needs to be adequately trained in the strong feelings that often develop between patient and therapist (transference) including feeling of sexual attraction that can never be acted upon.  Having these feelings and understanding where they come from in the safety of the therapy is in fact part of the therapy.  Likewise, trained counselors are trained to anticipate strong feeling that can develop in them for the patient (counter-transference) that likewise need to be understood as part of the therapy and again can

never be acted upon. The foundation for the boundary violations that later occurred were put in place when Dr. Beaumont continued to provide counseling (therapy) for Ms. Jacques.

Dr. Beaumont testified that he did not attempt psychoanalysis, but he was clearly providing therapy to Ms. Jacques. Psychoanalysis is quite different than psychotherapy, but as discussed above, the feelings associated with transference and countertransference certainly develop in the patient-therapist relationship and are not limited to pyschoanalysis.

Dr. Beaumont testified that at the time he counseled Ms. Jacques he was not aware of the processes of transference and countertransference. Likewise, Dr. Severin, his Medical Director, did not understand these anticipated companions of the therapeutic process. Furthermore, Dr. Severin testified that he did not provide training to Dr. Beaumont about it as a resident or as a junior physician.

Not surprisingly, Dr. Beaumont failed to appreciate the feelings Ms. Jacques quickly developed for him. He did recognize that Ms. Jacques was behaving in a way that he considered inappropriate towards him, and told Dr. Severin about this behavior. Dr. Beaumont had reported to Dr. Severin and Ms. Winbush, the responsible Administrator for the Center, that Ms. Jacques was infatuated with him, was seeing him outside of the office, was showing up at his church in a way that caused him concern, and believed that she should only be treated by him and nobody else, Dr. Severin advised him that he should not see Ms. Jacques as a patient, but failed to understand that the feelings the patient was acting on grew out of the counseling process and would be highly likely to persist. He neither supervised Dr. Beaumont with respect to the importance of steering his patient to an appropriately trained therapist nor the importance of and reasons that made it imperative that Dr. Beaumont avoid treating or seeing the patient in the future. Consistent with the standard of care and given the supervisory responsibility that Dr. Severin had with respect to Dr. Beaumont and his department he should have been aware of the concepts of transference and countertransference and he also should have referred Dr. Beaumont to an appropriate person for additional training to understand the concepts of transference and countertransference when treating his patients.

In addition, in accordance with the standard of care Dr. Severin should have taken steps to alert staff at Codman Square Health Center that Dr. Beaumont should not treat or see Ms. Jacques and to put in place systems to assist in making sure that Dr. Beaumont not see Ms. Jacques at the Center. As the Medical Director with supervisory responsibility for this situation, having been alerted to the strong feelings that Ms. Jacques had developed for Dr. Beaumont he also had a duty pursuant to the standard of care to put in place a system to provide that he be alerted if there were any future attempts by the patient to see Dr. Beaumont at the Heath Center. No such system was put in place. There are numerous electronic medical systems that could be used to provide for such alerts. Dr. Severin instructed Administrator Jo Ann Winbush to find Ms. Jacques a new physician, but did nothing further to follow up to make sure that there was an adequate system in place so that Ms. Jacques was not seen by Dr. Beaumont again. It should have been anticipated that Ms. Jacques, given her strong feelings for Dr. Beaumont would persist in trying to see Dr. Beaumont. Given his limited training and experience in these

circumstances any further contact would foreseeably place her at great risk of boundary violations.

Ms. Winbush also shares responsibility in her administrative position for failing to take adequate steps to prevent future contact at the Center between Ms. Jacques and Dr. Beaumont. Although the testimony of staff at Codman Square Health Center varies on this issue, it appears that during the time Ms. Jacques treated with Dr. Beaumont, Codman Square had a scheduling system that allowed notes to be entered for patients, that schedulers might review before scheduling the patient, but might not. As an administrator, Ms. Winbush was aware of this. Notwithstanding this, she failed to take adequate steps, in accordance with the standard of care applicable to her in her administrative position, to ensure that staff responsible for scheduling Ms. Jacques, and for meeting with her before she was seen by Dr. Beaumont, were aware that she should not be seen by him. Among other things, she failed to send any formal memo or email to all staff responsible for scheduling patients, and to the nursing assistants who worked with Dr. Beaumont, instructing them that Dr. Beaumont was not to see Ms. Jacques.

Ms. Winbush also failed to instruct staff that if Dr. Beaumont did in fact treat Ms. Jacques that they needed to report this to her or another administrator and to Dr. Severin. This was a departure from the standard of care. As stated above, Dr. Beaumont had reported to Dr. Severin and Ms. Winbush that Ms. Jacques was infatuated with him, was seeing him outside of the office, was showing up at his church in a way that caused him concern, and believed that she should only be treated by him and nobody else. Given her history, Ms. Jacques infatuation with Dr. Beaumont created a foreseeable risk of boundary violations in any further meetings. Dr. Severin and Ms. Winbush had a duty, in accord with the standard of care, to prevent her from being treated by or in fact seen by him at Codman Square ever again.

Dr. Severin departed from the standard of care when he delegated the task of ensuring that Ms. Jacques not be treated by Dr. Beaumont to Ms. Winbush and took no further steps to make sure an acceptable system was in place to prevent such future contact and provide notification to him if attempts were made for further contact. As Medical Director he knew, or in accordance with the standard of care should have known, that the systems and processes in place (as described above) were inadequate to prevent Ms. Jacques from being treated by Dr. Beaumont in the future. He also departed from the standard of care in failing to instruct Ms. Winbush to put a process in place so that he would be notified if Dr. Beaumont ever treated Ms. Jacques again.

Not surprisingly, after the patient was permitted to see Dr. Beaumont at the Center, the strong feelings already present in Ms. Jacques, which clearly became reciprocated by Dr. Beaumont, overwhelmed them and the predictable boundary violations began with devastating results. After a pregnancy and great emotional distress that was all sadly foreseeable, Ms. Jacques was devastated and became suicidal. She has suffered and continues to suffer significant emotional and physical injuries as a result of the defendants' conduct.

Of course none of this excuses Dr. Beaumont from his individual responsibility and his departures from the standard of care in treating a patient in areas well beyond his

expertise, and then engaging in unethical conduct. Dr. Beaumont departed from the standard of care when he undertook to, and then continued to, provide counseling to Ms. Jacques, given her history and significant issues impacting her mental health. Had Dr. Beaumont insisted that she receive counseling from a behavioral health practitioner, or, in accordance with the standard of care, refused to provide counseling to her given his lack of qualifications, it is very unlikely that they would have developed feelings for each other or ever started a sexual relationship.

Likewise, had Dr. Severin and/or Jo Ann Winbush acted appropriately and in accordance with the standard of care when Dr. Beaumont first brought to their attention the very strong feelings of attraction to him that had developed in Ms. Jaques and her apparent inability to control them on her own, it is likely that the boundary violations that occurred thereafter would have been avoided.

I declare certify under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of April, 2014.

_____
Jerry Blaine, MD