UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YANICK JACQUES,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>MARK BEAUMONT, MD,<br>and CODMAN SQUARE HEALTH<br>CENTER, INC.<br><br>    Defendants. | C.A. NO.: 1:13-cv-10520-DJC |

## OPPOSITION OF THE DEFENDANT, MARK BEAUMONT, M.D., TO THE UNITED STATES OF AMERICA'S AND CODMAN SQUARE HEALTH CENTER, INC.'S <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In their Motions for Summary Judgment, the United States of America and Codman Square Health Center, Inc., seek summary judgment as to their liability by arguing that Codman's Medical Director, Dr. Philip Severin, and its administrator, Jo-Ann Winbush, had no duty to act.[1] They further claim that a duty to act arises only where there is foreseeable harm, and the boundary violations that occurred in the physician-patient relationship between the defendant, Mark Beaumont, M.D., and the plaintiff, Yanick Jacques, were not reasonably foreseeable. It is axiomatic, however, that Dr. Severin and Ms. Winbush had a duty to ensure each medical provider at

---

[1] The United States and Codman further argue that they are entitled to summary judgment because Dr. Beaumont's conduct was not a "medical ... or related function," or was outside the scope of his employment at Codman. These arguments are addressed in the plaintiff's oppositions to the United States' and Codman's motions for summary judgment. Dr. Beaumont hereby adopts the arguments set forth in the plaintiff's oppositions solely to the extent they assert that the plaintiff's complaint claims that Dr. Beaumont was negligent in providing "medical functions" that were within the scope of his employment and, therefore, the FTCA applies and the United States and Codman may be vicariously liable for the Dr. Beaumont's alleged negligence.

1

Codman was properly trained to treat his or her patients various medical conditions. Yet Dr. Beaumont, who was providing mental health care and therapy to a patient with a complex psychiatric history, had minimal expertise in psychiatry and no knowledge regarding the concepts of transference and counter-transference. Given Dr. Beaumont's lack of training on these concepts, and given the strong feelings of love and attraction Ms. Jacques expressed for Dr. Beaumont, it was reasonably foreseeable that further medical visits would place Ms. Jacques at a high risk for boundary violations. As a result, once Dr. Severin and Ms. Winbush became aware of Ms. Jacques' feelings and actions, they had a duty to act with reasonable care to prevent such boundary violations by preventing Ms. Jacques from further treating with Dr. Beaumont. In fact, this is exactly what they attempted, but failed, to do. Indeed, they took affirmative steps in an effort to transfer Ms. Jacques care to another provider. Thus, even assuming they did not have a duty to act, Dr. Severin and Jo-Ann Winbush nonetheless assumed such a duty by at least attempting to prevent Ms. Jacques from treating with Dr. Beaumont after Dr. Beaumont raised specific concerns regarding Ms. Jacques' feelings for him. Once they assumed a duty of preventing Ms. Jacques from seeing Dr. Beaumont they had a duty to use reasonable care to make sure their actions would be effective. Yet the minimal actions taken by Dr. Severin and Ms. Winbush were wholly inadequate and predictably fallible. As a result, Ms. Jacques was able to schedule further treatment visits with Dr. Beaumont, and predictable boundary violations followed many months later. For these reasons, there is sufficient evidence for a reasonable jury to find that both Dr. Severin and Ms. Winbush acted negligently, and the United States and Codman's motions should be denied.

## **STATEMENT OF FACTS**

The following facts briefly summarize the inadequate training provided by Codman and the insufficient actions taken by Dr. Severin and Ms. Winbush to prevent Ms. Jacques from further treating with Dr. Beaumont. These facts and others are more fully set forth in the accompanying Statement of Facts in Support of the Defendant's, Mark Beaumont, M.D.'s, Opposition ("SOF").

After receiving his medical degree in in 2003, Dr. Beaumont completed portions of his residency training at Codman. SOF ¶ 1. During his medical and residency training, Dr. Beaumont received minimal training on providing psychiatric care. *Id.* In 2005, following his residency training, Dr. Beaumont was hired by Codman to work as a primary care provider in the Family Medicine Group. *Id.*

Dr. Philip Severin was Codman's Medical Director and Dr. Beaumont's supervisor. *Id.* ¶ 2. As the Medical Director overseeing Clinical Quality at Codman, Dr. Severin agrees that he had a duty to use reasonable care. *Id.* Dr. Severin believes it is important for all of the physicians who work for him to know and understand the risks of transference and counter-transference between patients and doctors. *Id.* ¶ 4. Dr. Severin understands that transference and counter-transference can create a risk for patients and believes it is important for doctors to understand these concepts to help them maintain proper professional boundaries. *Id.* at ¶¶ 3, 4. Dr. Severin was also aware that transference and counter-transference can create feelings of love between a patient and doctor, and can interfere with the boundaries in the physician-patient relationship. *Id.* at ¶ 3. Nonetheless, Codman provided no training regarding transference and counter-transference, and Dr. Severin is not aware whether Dr.

Beaumont received any training regarding transference and counter-transference at Codman or elsewhere. *Id.* at ¶ 4. Prior to this lawsuit, Dr. Beaumont did not know about, and had received no training regarding the concepts of transference and counter-transference. *Id.* ¶ 5.

Dr. Beaumont first began treating Ms. Jacques in October 2007. At the time Ms. Jacques began treating with Dr. Beaumont she was 33 years old and had three children. SOF ¶ 7. Ms. Jacques had a significant history of anxiety, depression, PTSD, sexual abuse, rape, and multiple suicide attempts. *Id.* From the time of Dr. Beaumont's first visit with Ms. Jacques in 2007, Dr. Beaumont felt that Ms. Jacques needed to be treated in Codman's Behavioral Health Department because her psychiatric needs were beyond the scope of his training and what he felt comfortable treating or managing as her family doctor. *Id.*[2] In January 2008, Dr. Beaumont referred Ms. Jacques to Codman's Behavioral Health Unit for psychiatric counseling. SOF ¶ 9. Ms. Jacques declined the referral, noting that she only wanted to see Dr. Beaumont. *Id.* Dr. Beaumont responded that he was not comfortable with her not being seen by Behavioral Health and only seeing him for her psychiatric needs. *Id.* Ms. Jacques ultimately first received treatment in the Behavioral Health Unit in August 2008, when Dr. Beaumont referred her there emergently for evaluation of anxiety, depression, and suicidal ideation. *Id.*

During the period from January 28 through November 2008, Ms. Jacques saw Dr. Beaumont approximately 23 times. SOF ¶ 10. In many of those visits Dr. Beaumont

---

[2] Dr. Beaumont testified that there was a pervasive sense of discomfort among primary care providers at Codman regarding treating the fair number of primary care patients who required Behavioral Health services and care. SOF ¶ 8. The discomfort stemmed from the fact that primary care providers are not trained or licensed to provide psychiatric care, but there was a shortage of Behavioral Health psychiatrists and counselor's at the facility. Id.

4

provided Ms. Jacques with mental health counseling for anxiety disorder, PTSD, and depression, and he assessed her suicidal ideation and safety. SOF ¶ 11. Because Dr. Beaumont had never been trained in psychiatry, he did his best to treat Ms. Jacques within the limits of his training as a physician, informed Ms. Jacques of those limitations, and encouraged her to address her psychiatric issues with her psychiatrist or counselor. *Id.*

In late 2008, however, Dr. Beaumont perceived that the nature of the physician patient relationship with Ms. Jacques was changing. SOF ¶ 12. During this time, Dr. Beaumont was becoming increasingly concerned about his ability to be Ms. Jacques' doctor because Ms. Jacques was non-compliant with his recommendations, was not adhering to his treatment plan, and was scheduling visits with him that he did not authorize. *Id.* She was also coming in for unscheduled visits. *Id.* Ms. Jacques also approached Dr. Beaumont and his family at church, expressed romantic feelings for Dr. Beaumont during office visits, asked him for a hug, and asked him for a date. *Id.*

Given his increasing concerns, Dr. Beaumont discussed Ms. Jacques' case with his supervisor, Dr. Severin, to get Dr. Severin's input and assistance. SOF ¶ 13. During the conversation with Dr. Severin, Dr. Beaumont detailed his concerns regarding Ms. Jacques crossing boundaries with him. *Id.* He explained that the physician-patient was becoming increasingly personalized, and he felt Ms. Jacques was developing romantic feelings towards him, and had unrealistic expectations for treatment. *Id.* Dr. Beaumont further explained that Ms. Jacques often came to the clinic without an appointment, seemed to expect that Dr. Beaumont would treat her and no one else, and began attending the church that Dr. Beaumont attended with my family. *Id.* Dr.

5

Beaumont told Dr. Severin that Ms. Jacques at one point asked him for a date and expressed his concerns that Ms. Jacques was not adhering to his treatment plan and was disregarding his numerous efforts and attempts to refer her to a behavioral health professional for management of her psychiatric needs. *Id.* Dr. Severin agreed to assist Dr. Beaumont by transferring Ms. Jacques care to another provider.

Together Dr. Severin and Dr. Beaumont then spoke with Jo Ann Winbush, regarding Dr. Beaumont's concerns and how the transfer would occur. SOF ¶ 14. In speaking with Ms. Winbush, Dr. Beaumont again detailed his concerns about Ms. Jacques crossing personal boundaries, not following his treatment plan to see a behavioral health provider even after he made referrals, making appointments that he did not schedule, and getting too close to him. *Id.* Ms. Winbush told Dr. Beaumont that steps would be taken immediately to get the patient transferred to another provider. Id. Ms. Winbush also told Dr. Beaumont that she would make the necessary changes in the computer system, notify the secretaries, and that Ms. Jacques should not be scheduled with him in the future. *Id.* Ms. Winbush made it explicitly clear that the patient would be transferred and that Dr. Beaumont would not see her again, and she reassured Dr. Beaumont that she would confer with her administrators and speak with the secretaries so that if Ms. Jacques called again to make an appointment with Dr. Beaumont the appointment would not be scheduled. *Id.* at 52:11-23.

On November 24, 2008, Ms. Jacques called to make an appointment with Dr. Beaumont. SOF ¶ 15. Dr. Beaumont informed Carmen Cruz in the Behavioral Health Unit about his concerns regarding Ms. Jacques' medical and overall management. Id. He further informed Ms. Cruz that Ms. Jacques had often crossed boundaries, coming

to the clinic without an appointment and asking to be seen, having the expectation that Dr. Beaumont will only treat her, and talking to him at church. *Id.* Dr. Beaumont expressed concerns of safety for his family. *Id.* He also noted Ms. Jacques long history of attachment problems, often feeling abandoned and betrayed mostly by men, her history of troubled relationships, molestation and rape, PTSD, and anxiety disorder. *Id.* He recommended that she be transferred to a another provider, preferably a female provider in another department. *Id.*

Leading up to the transfer of Ms. Jacques' care there was a meeting with Ms. Jacques, Carmen Cruz,[3] Jo Ann Winbush, and Dr. Severin to discuss the details of the transfer. SOF ¶ 16. Dr. Beaumont was called into the meeting after it began. *Id.* During the meeting, Ms. Jacques stated that she "loved [Dr. Beaumont]". *Id.* Ms. Winbush summarized why Ms. Jacques needed to be transferred to a new provider and noted that Ms. Jacques had been noncompliant and had developed personal feelings for Dr. Beaumont. *Id.* Dr. Beaumont stated that he was in agreement with the transfer and was then excused from the meeting. *Id.* Following the meeting, Ms. Jacques care was transferred to the 2nd floor Internal Medicine department to see a different provider, Loretta Donald, NP. *Id.*

Dr. Severin has no memory of speaking with Dr. Beaumont regarding Ms. Jacques but believes Dr. Beaumont reached out to him about his concerns around the relationship with Ms. Jacques and believes it is probable that he then asked one of Codman's managers to step in to help with reassignment of Ms. Jacques to another

---

[3] Ms. Cruz was concerned about Ms. Jacques thoughts regarding Dr. Beaumont. SOF ¶ 18. She knew based on her education, training and experience that providers treating patients like Ms. Jacques, with significant PTSD, needed to be more aware of potential boundary violations. Id.. She also believed that it was not the best treatment for a patient to receive mental health treatment from a primary care provider because a primary care provider does not have the proper training. Id.

7

provider. SOF ¶ 19. In such circumstances, Dr. Severin expected the manager to initiate follow-up to resolve the issue, or reassign the patient to a different provider. *Id.* On those occasions the patient was reassigned, he would expect the manager to follow through to take steps to make sure the patient did not continue to see the former provider. *Id.* Those steps would include reassigning the responsible provider in the electronic medical record, and creating some sort of note within the practice management system, like an alert that would alert somebody trying to schedule an appointment so that an appointment would not be scheduled with the former provider. *Id.* Dr. Severin would further expect the manager to inform the caregivers involved so that they are aware of the situation. *Id.*[4]

After reassigning Ms. Jacques to Loretta Donald, Ms. Winbush understood that Ms. Jacques would now have a new primary care provider and that if she came back to Codman she would be seen by Loretta Donald. SOF ¶ 21. Nonetheless, even after the reassignment, Ms. Winbush expected that if Ms. Jacques asked for an appointment with Dr. Beaumont, she would be scheduled to see Dr. Beaumont. *Id.* She understood that there would not be anything in place to alert the schedulers not to schedule Ms. Jacques with Dr. Beaumont. Ms. Winbush did not put anything in place to prevent schedulers from scheduling Ms. Jacques to see Dr. Beaumont and did not put anything in the computer system to raise a red flag. *Id.* In fact, following the meeting with Dr. Beaumont and Ms. Jacques, the only thing Ms. Winbush did was to schedule Ms. Jacques to see Loretta Donald and tell Dr. Beaumont to speak to Dr. Severin. *Id.* She never alerted the staff that Ms. Jacques should not be further scheduled with Dr.

---

[4] Sandra Cotterell, Codman's Chief Operating Officer, testified that Codman expected a manager reassigning a patient to a new physician to make sure that the reassignment was effectuated. SOF ¶ 24.

Beaumont, and did not ask the clinical unit or the schedulers to alert her if Ms. Jacques tried to schedule an appointment with Dr. Beaumont. *Id.*

There is much confusion regarding whether Codman's electronic records and scheduling system allowed alerts to be placed on the computer in the relevant time frame. SOF ¶¶ 22, 23, 24. Although the current system allows users to insert pop-up alerts to notify schedulers not to schedule a specific patient with a specific doctor, it is unclear whether this system was in place in 2008 and 2009. SOF ¶ 24. Furthermore, it is unclear whether the older system allowed comments to be placed in the electronic records to alert schedulers and whether those comments would be used in the present circumstances. SOF ¶¶ 23, 24. There is no evidence that any type of alert or pop-up was placed in Ms. Jacques chart to alert schedulers not to schedule her for appointments with Dr. Beaumont. Furthermore, Codman did not send emails or written memos to staff regarding the scheduling of specific patients. SOF ¶ 54. Instead, Codman relied solely on oral communications to ensure that a particular patient was not scheduled with a particular physician. Sandra Cotterell, Codman's Chief Operating Officer, testified that it would be challenging in a busy practice, where patients are calling and walking in all the time, for the staff to recall that a specific patient should not be seen by a specific doctor. SOF ¶ 24.

Perhaps as a result of this predictably ineffective system, only six months after Ms. Jacques' care was transferred to another provider, she saw Dr. Beaumont again for treatment on March 12, 2009, when she came to Codman for an Urgent Care visit. SOF ¶ 25. Then, approximately one month later, on April 23, 2009, Ms. Jacques was

9

scheduled to see Dr. Beaumont again. SOF ¶ 26.[5] On this occasion, Ms. Jacques had called Codman and asked to be seen by Dr. Beaumont. *Id.* Dr. Beaumont did not have any input into whether she would be allowed to see him, and he was surprised to see her. *Id.* Prior to treating Ms. Jacques Dr. Beaumont expressed his immediate concern to his medical assistant and went to speak with Ms. Winbush to inform her that he was very unhappy Ms. Jacques had been allowed to make an appointment with him. Id. Ms. Winbush told Dr. Beaumont "[w]ell, you know, Dr. Beaumont, anyone can book appointments in the building. It's not—you know, patients have rights, if they want to see someone, they can." *Id.* Thereafter, Ms. Winbush did not put anything in Ms. Jacques file to indicate that she should not see Dr. Beaumont. *Id.* Further, despite Dr. Beaumont's concern, Ms. Winbush did nothing to follow up on the issue because it was not unusual at Codman that a patient gets on a doctor's schedule that they are not supposed to be on. *Id.*

In February or March 2010, Dr. Beaumont visited Ms. Jacques at her home to see how she was doing. SOF ¶ 28. He knew that she was dissatisfied with the care she was receiving at Codman and had lots of questions. *Id.* Dr. Beaumont visited Ms. Jacques home several more times between February and May 2010. *Id.* In May 2010, Dr. Beaumont and Ms. Jacques began a sexual relationship. *Id.*

After the sexual relationship began, Ms. Jacques again called Codman and made an appointment to be seen by Dr. Beaumont. SOF ¶ 29. No one at Codman spoke with

---

[5] After the transfer of care in November 2008, Ms. Jacques saw Loretta Donald, N.P., (who worked in the Internal Medicine Department), only once and then transferred herself back to the Family Medicine Department where Dr. Beaumont worked. SOF ¶ 27. At that time she was treated by Family Medicine Residents. Id. Additionally, although Dr. Beaumont was not providing Ms. Jacques care over this period, Ms. Jacques had access to Dr. Beaumont's pager and paged him numerous times to express her displeasure with the Residents' care. Id.

10

Dr. Beaumont about scheduling the appointment with him. Indeed, Dr. Beaumont did not know about the visit until the day it happened, which was May 27, 2010. *Id.* At that visit, Dr. Beaumont saw Ms. Jacques at Codman for medical care, and inserted an IUD at Ms. Jacques' request. SOF ¶ 30.

Dr. Beaumont saw Ms. Jacques again for medical care at Codman in October 2010. SOF ¶ 31. As with the prior visits, Dr. Beaumont had no role in making the appointment and first learned he would be seeing Ms. Jacques when he walked into the exam room. *Id.* Ms. Jacques then had three medical visits with Dr. Beaumont in 2011. SOF ¶ 32. Some of those visits included mental health counseling. *Id.*

Over the period from May 2010 through April 2011, Dr. Beaumont and Ms. Jacques continued their sexual relationship and had sexual relations at Codman. SOF ¶ 33. According to Ms. Jacques, during the period of their sexual relationship, Dr. Beaumont continued to counsel her both at the office and outside the office. *Id.*

In April 2011, Ms. Jacques became pregnant with Dr. Beaumont's child. SOF ¶ 34. They discussed an abortion and Ms. Jacques later learned that the pregnancy was ectopic and it was terminated. *Id.* Thereafter, Dr. Beaumont and Ms. Jacques ended their relationship and Ms. Jacques entered inpatient psychiatric care at Beth Israel Deaconess Medical Center followed by outpatient care. SOF ¶ 35. She now claims that the defendants' allegedly negligent conduct caused her to become devastated to the point where she became sick, suffered headaches, stomach pain, and insomnia, lost self-respect and ambition, and engaged in reckless behavior including excessive drinking. SOF ¶ 26.

## **ARGUMENT**

### I. DR. SEVERIN AND MS. WINBUSH HAD A DUTY TO PREVENT MS. JACQUES FROM TREATING WITH DR. BEAUMONT AFTER BECOMING AWARE OF MS. JACQUES' INFATUATION.

In its motion for summary judgment the United States claims that Dr. Severin and Ms. Winbush had no duty to act because such a duty arises only where there is foreseeable harm. The United States further argues that the sexual relationship that occurred between Dr. Beaumont and the plaintiff was not reasonably foreseeable because Dr. Beaumont did not inform Dr. Severin or Ms. Winbush that he had romantic feelings for Ms. Jacques. This argument ignores the factual background of this matter, and unconvincingly argues that, despite the concerns expressed by Dr. Beaumont regarding Ms. Jacques' behavior and despite Ms. Jacques' expressed infatuation with Dr. Beaumont, Dr. Severin and Ms. Winbush had no duty to prevent Ms. Jacques from seeing Dr. Beaumont unless and until Dr. Beaumont informed them that he had romantic feelings for his patient. This cannot be the applicable standard. Rather, when accurately portrayed, the facts of this matter provide sufficient evidence from which a reasonable jury could conclude that, based on Dr. Beaumont's minimal training and experience with psychiatric care and Ms. Jacques' strong feelings for Dr. Beaumont, it was reasonably foreseeable that boundary violations could occur if the treatment continued. As a result, Dr. Severin and Ms. Winbush had a duty to act.

When Dr. Beaumont became concerned regarding his continued treatment of Ms. Jacques, he brought the matter to Dr. Severin's attention to obtain his input and assistance. SOF ¶ 13. During the conversation, Dr. Beaumont detailed his concerns regarding Ms. Jacques crossing boundaries with him. *Id.* He told Dr. Severin that the

physician-patient relationship was becoming increasingly personalized, and that he felt Ms. Jacques was developing romantic feelings towards him. *Id.* He further informed Dr. Severin that Ms. Jacques had asked him for a date, asked him for a hug, and approached him and his family at church. *Id.* Additionally, Dr. Beaumont told Dr. Severin that Ms. Jacques often came to the clinic without an appointment, seemed to expect that Dr. Beaumont would treat her and no one else, and had unrealistic treatment expectations. *Id.* Based on these concerns, Dr. Severin agreed to assist Dr. Beaumont by transferring Ms. Jacques care to another provider. *Id.*

Dr. Severin enlisted Ms. Winbush's assistance in effectuating the transfer. SOF ¶ 14. When Dr. Beaumont and Dr. Severin met with Ms. Winbush, Dr. Beaumont again described his concerns regarding Ms. Jacques' behavior. *Id.* Ms. Winbush assured him that she would make the necessary changes in the computer system, notify the secretaries, and confer with her administrators to make sure that Ms. Jacques was not scheduled to see Dr. Beaumont again. *Id.*

From these facts it is evident that Dr. Severin and Ms. Winbush did foresee a risk of harm to Ms. Jacques stemming from her continuing to treat with Dr. Beaumont and took steps to prevent that harm by transferring her care to a new provider and preventing her from scheduling further visits with Dr. Beaumont. Accordingly, the United States' argument is belied by Dr. Severin's and Ms. Winbush's own actions.

Even assuming, however, that Dr. Severin and Ms. Winbush did not foresee harm from Ms. Jacques continuing to treat with Dr. Beaumont, they should have. It is axiomatic that Dr. Severin and Ms. Winbush had a duty to ensure each medical provider at Codman is properly trained to treat the provider's patients and those patient's various

medical conditions. Yet Dr. Beaumont, who was providing mental health care and therapy to a patient with a complex psychiatric history, had minimal training or expertise in psychiatry and no knowledge regarding the concepts of transference and counter-transference. SOF ¶ 1. Given Dr. Beaumont's lack of training, and given the strong feelings of love and attraction Ms. Jacques expressed for Dr. Beaumont, it was reasonably foreseeable that further medical visits would place Ms. Jacques at a high risk for boundary violations. Indeed, Dr. Severin was aware that transference and counter-transference can create a risk for patients and that it is important for the doctors who work in his clinic to understand these concepts to help them maintain proper professional boundaries. SOF ¶¶ 3,4. Dr. Severin also knew that transference and counter-transference can create feelings of love between a patient and doctor, and can interfere with the boundaries in the physician patient relationship. *Id.* As a result, not only did Dr. Severin have a duty to ensure that Dr. Beaumont was properly trained regarding transference and counter-transference, but he and Ms. Winbush should have foreseen that Dr. Beaumont's lack of training and limited experience in psychiatric care, combined with Ms. Jacques obvious infatuation with Dr. Beaumont, created a high risk of boundary violations if the treatment relationship continued.

For these reasons, Dr. Severin and Ms. Winbush had a duty to use reasonable care to protect Ms. Jacques by precluding further treatment visits with Dr. Beaumont.

## II. EVEN ASSUMING DR. SEVERIN AND MS. WINBUSH DID NOT HAVE A DUTY TO ACT, THEY ASSUMED SUCH A DUTY BY TAKING AFFIRMATIVE STEPS TO PREVENT MS. JACQUES FROM TREATING WITH DR. BEAUMONT.

It is an established principle that a duty voluntarily assumed must be performed with due care. See *Mullins v. Pine Manor College*, 389 Mass. 47, 52-52 (1983). "If a person voluntarily assumes a duty or undertakes to render services to another that should have been seen as necessary for her protection, that person may be liable for harm caused because of the negligent performance of his undertaking." *Thorson v. Mandell*, 402 Mass. 744, 748 (1988). See also *Cottam v. CVS Pharmacy*, 436 Mass. 316, 323-324 (2002). Dr. Severin and Ms. Winbush voluntarily undertook to transfer Ms. Jacques care to another provider and prevent her from treating with Dr. Beaumont in the future. In fact, Ms. Winbush assured Dr. Beaumont that she would take the necessary steps to prevent Ms. Jacques from treating with Dr. Beaumont and made it clear that Dr. Beaumont would not see Ms. Jacques again. SOF ¶ 14. As noted above, Dr. Severin and Ms. Winbush took these affirmative steps because they did, or should have, foreseen them as necessary for the plaintiff's protection. As a result, Dr. Severin and Ms. Winbush had a duty to use due care in preventing Ms. Jacques from treating again with Dr. Beaumont and they may be liable for the harm caused because of their negligent performance of this undertaking. *Ibid*.

## III. THE STEPS TAKEN BY DR. SEVERIN AND MS. WINBUSH TO PREVENT MS. JACQUES FROM TREATING WITH DR. BEAUMONT WERE WHOLLY INADEQUATE AND PREDICTABLY FALLIBLE.

Dr. Severin and Ms. Winbush endeavored to transfer Ms. Jacques care and treatment to another provider but then did nothing to ensure that the transfer would be effective, or to prevent Ms. Jacques from scheduling further appointments with Dr.

Beaumont, or to prevent the treatment relationship from continuing. Furthermore, the steps that Dr. Severin and Ms. Winbush took to prevent Ms. Jacques from further treating with Dr. Beaumont were so inadequate that they were almost sure to fail.

After being asked by Dr. Severin to transfer Ms. Jacques care, and after Ms. Winbush assured Dr. Beaumont that she would take the necessary steps, Ms. Winbush did almost nothing to ensure that Ms. Jacques would not be seen by Dr. Beaumont again. Although Dr. Severin expected in these circumstances that a manager would follow up and take steps to make sure the patient did not continue to see the former provider by, among other things, creating a note in the practice system that would alert a scheduler not to schedule the patient with the former physician, Ms. Winbush did not create any note in the system. SOF ¶¶ 14, 19, 21. She apparently did not even place a written note in the patient's chart. SOF ¶ 19. In fact, Ms. Winbush testified that she did not put anything in place to prevent schedulers from scheduling Ms. Jacques to see Dr. Beaumont again. *Id.* She did not alert the staff that Ms. Jacques should not be further scheduled with Dr. Beaumont, and did not ask anyone to alert her if Ms. Jacques tried to schedule an appointment with Dr. Beaumont. *Id.* Even assuming she did alert the staff, however, relying solely on verbal communications was almost sure to fail in a busy practice. Indeed, Sandra Cotterell, the Chief Operating Officer and Codman's 30(b)(6) designee, testified that it would be challenging in a busy practice, where patients are calling and walking in all the time, for the staff to recall that a specific patient should not be seen by a specific doctor. SOF ¶ 24. Another witness, Maria Charlesman, who was one of the secretaries at Codman, testified that in 2008 there was simply no system in place to alert schedulers not to schedule a specific patient with a specific doctor. SOF ¶

16

23. Given the obvious flaws in the steps taken by Dr. Severin and Ms. Winbush, perhaps it is not surprising that after taking these steps Ms. Winbush expected that if Ms. Jacques subsequently asked for an appointment with Dr. Beaumont, an appointment would be scheduled.

Furthermore, even after Ms. Jacques was scheduled to see Dr. Beaumont again in March and April 2009, Dr. Severin and Ms. Winbush failed to recognize that their efforts had failed and take further action. Instead they did nothing. When Dr. Beaumont informed Ms. Winbush that he was concerned and unhappy that Ms. Jacques had been scheduled to see him, Ms. Winbush told him that "patients have rights, if they want to see someone they can." SOF 26. It is not surprising, therefore, that Ms. Jacques was able to schedule more appointments with Dr. Beaumont and that the treatment relationship continued.

As a result of Dr. Severin's and Ms. Winbush's failure to use reasonable care, Ms. Jacques was permitted to continue treatment with Dr. Beaumont, and predictable boundary violations occurred thereafter. Given Ms. Jacques' stated infatuation with Dr. Beaumont, Dr. Beaumont's limited training, and the dangers of transference and counter-transference in the setting of mental health care, Dr. Severin and Ms. Winbush should have foreseen such harm and they may be held liable for such actions.

## CONCLUSION

Usually "the question of negligence is one of fact for the jury. Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury. *Luz v. Stop & Shop, Inc. of Peabody*, 348 Mass. 198, 203–204 (1964). *Beaver v. Costin*, 352 Mass. 624, 626 (1967)." *Zezuski v. Jenny Mfg.*

Co., 363 Mass. 324, 327 (1973). For the reasons stated above, there is sufficient evidence in this matter from which the jury could conclude that Dr. Severin and Ms. Winbush were negligent and, therefore, Dr. Beaumont respectfully requests that the United States' and Codman's Motions for Summary Judgment be DENIED.

> The Defendant,
> Mark Beaumont, M.D.,
> By his attorneys,
>
> _____
> George E. Wakeman, Jr., BBO #512230
> Brooks L. Glahn, BBO# 648308
> Adler | Cohen | Harvey | Wakeman | Guekguezian, LLP
> 75 Federal Street, 10th Floor
> Boston, MA 02110
> (617) 423-6674
> gwakeman@adlercohen.com
> bglahn@adlercohen.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this document will be served electronically to the attorney of record for each party via the ECF system.

/s/ Brooks L. Glahn

Dated: June 19, 2014