UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YANICK JACQUES,

     Plaintiff,

v.

UNITED STATES OF AMERICA,
MARK BEAUMONT, MD,
and CODMAN SQUARE HEALTH
CENTER, INC.

     Defendants.

C.A. NO.:  1:13-cv-10520-DJC

**STATEMENT OF FACTS IN SUPPORT OF THE DEFENDANT'S, MARK BEAUMONT, M.D.'S, OPPOSITION TO THE DEFENDANTS', UNITED STATES OF AMERICA'S AND CODMAN SQUARE HEALTH CENTER, INC.'S,
<u>MOTIONS FOR SUMMARY JUDGMENT</u>**

     The defendant, Mark Beaumont, M.D., submits the following statement of facts in support of his opposition to the United States' and Codman Square Health Center's Motions for Summary Judgment:[1]

     1.    After receiving his medical degree in 2003, the defendant, Dr. Beaumont, did part of his residency training at Codman Square Health Center, Inc. ("Codman"). During his residency training Dr. Beaumont received minimal training on psychiatric care.  *See* Beaumont deposition at 122:17-123:2 at **Exhibit 1**.  He began working at Codman in 2005 as a primary care provider in the Family Medicine Group.  *Id.*

     2.    Dr. Philip Severin was the Medical Director at Codman and Dr. Beaumont's supervisor.  He oversaw clinical quality at Codman.  *See* Severin

---

[1] To the extent that the facts set forth herein do not directly controvert the facts set out in the Joint Statement of Defendants United States of America and Codman Square Health Center, Inc., Dr. Beaumont specifically reserves his rights to contest such facts.

deposition at 36:9-18, at **Exhibit 2**.  He had a duty to Codman's patients as the Medical Director overseeing clinical quality to use reasonable care in exercising his duties.  *Id.* He does not recall the frequency that Dr. Beaumont had performance reviews, if he had any at all, but believes it should have been more frequently than every four or five years. *Id.* at 47:5-14.

3.      Dr. Severin understood that transference and counter-transference interfere with the boundaries in the physician-patient relationship. *Id.* at 54:15-23.  He knew that transference and counter-transference can create a risk for the patient because boundaries that are expected to be present in that relationship are, in fact, not present. *Id.* at 55:1-14.   He was further aware that transference and counter-transference can create feelings of love between a patient and a doctor. *Id.* at 55:15-20.

4.      Dr. Severin believes it is important for doctors to understand the concepts of transference and counter-transference to help with maintaining professional boundaries. *Id.* at 56:3-16.  He believes it is important for all doctors who work for him know and understand the risks of transference and counter-transference between patients and doctors. *Id.* at 57:9-17.  Codman, however, provided no training regarding transference and counter-transference.  *Id.* at 57:18-24.   Dr. Severin is not aware whether Dr. Beaumont received any training regarding transference and counter-transference at Codman or elsewhere. *Id.* at 61:4-64:12.

5.      Before this litigation Dr. Beaumont did not know about, and had received no training regarding, the concepts of transference and counter transference.  *See* Beaumont deposition, **Exhibit 1** at 123:8-21.

6.     The plaintiff, Yanick Jacques, received medical care at Codman from 2005 through June 2011.  *See* Exhibit 3 to United States and Codman Joint Statement of Fact.  Dr. Beaumont first treated Ms. Jacques in October 2007 and, although he was not her primary care physician at that time, at some point he became Ms. Jacques' primary care provider at Codman.  *Id.*

7.     At the time Ms. Jacques began treating with Dr. Beaumont she was 33 years old and had three children.  *See* Medical Records at **Exhibit 3**.  She had a significant history of anxiety, depression, PTSD, sexual abuse, rape, and multiple suicide attempts.  *Id.*  From the time of Dr. Beaumont's first visit with Ms. Jacques in 2007, Dr. Beaumont felt that Ms. Jacques needed to be treated in Codman's Behavioral Health Department because her psychiatric needs were beyond the scope of his training and what he felt comfortable treating or managing as her family doctor.  See Beaumont deposition, **Exhibit 1** at 20:5-10.

8.     There was a pervasive sense of discomfort among primary care providers at Codman regarding treating the fair number of primary care patients who required Behavioral Health services and care.  *Id.* at 21:25-22:12.  The discomfort stemmed from the fact that primary care providers are not trained or licensed to provide psychiatric care, but there was a shortage of Behavioral Health psychiatrists and counselor's at the facility.  *Id.*  As a result, Dr. Beaumont often saw Ms. Jacques primarily because there was a shortage of providers in the Behavioral Health department.  *Id.*

9.     In January 2008, Dr. Beaumont referred Ms. Jacques to Codman's Behavioral Health Unit for psychiatric counseling from a psychiatrist or counselor.  *Id.* at 16:4-18.  Ms. Jacques told Dr. Beaumont that she did not want to see anyone in the

Behavioral Health Unit, and that she only wanted to see Dr. Beaumont. *Id.* at 20:5-21. Dr. Beaumont instructed her that he was not comfortable with her not being treated by Behavioral Health and only seeing him for her psychiatric needs. *Id.* Ms. Jacques ultimately first received treatment in the Behavioral Health Unit on August 18, 2008, when Dr. Beaumont referred her urgently for acute anxiety, depression and suicidal ideation. *See* Exhibit 3 to United States and Codman's Joint Statement, and Medical Records at **Exhibit 3**.

10.     During the period from January 2008 through November 2008, Ms. Jacques saw Dr. Beaumont for treatment approximately 23 times. *See* Exhibit 3 to United States and Codman's Joint Statement.

11.     In many of the visits from 2007 through November 2008 Dr. Beaumont provided Ms. Jacques with mental health counseling, in addition to addressing her physical complaints. See Beaumont deposition, **Exhibit 1** at 13:6-14:7. In particular, Dr. Beaumont treated Ms. Jacques' anxiety disorder and PTSD, and assessed her suicidal ideation/safety. *Id.* at 110:17-112:5. He also recommended that she address these issues wither her psychiatrist or counselor. *Id.* at 111:14-112:2. Dr. Beaumont has never been trained in psychiatry, so he did his best to treat Ms. Jacques considering the limitations in his training. *Id.* at 112:21-113:2. He also shared with Ms. Jacques and the key administrators at Codman the limitations in his training and experience regarding psychiatric treatment. *Id.*

12.     In late 2008, Dr. Beaumont perceived that the nature of the physician-patient relationship with Ms. Jacques was changing. *Id.* at 29:20-32:16. During this time, Dr. Beaumont was becoming increasingly concerned about his ability to be her

provider because Ms. Jacques was non-compliant as a patient, was not adhering to his treatment plan, and was making visits with him that he did not authorize. *Id.* 30:3-11. She was also coming in for visits that Dr. Beaumont did not know about. *Id.* at 30:7-8. Ms. Jacques also approached Dr. Beaumont at church, expressed romantic feelings for him during office visits, asked him for a hug and asked him for a date. *Id.* at 30:8-32:16.

13.   Given his increasing concerns, Dr. Beaumont discussed Ms. Jacques' case with his supervisor, Dr. Severin, to get Dr. Severin's input and assistance. *See* Exhibit 4 to United States' and Codman's Joint Statement (USCS00441).   During the conversation with Dr. Severin, Dr. Beaumont detailed his concerns regarding Ms. Jacques crossing boundaries with him. *See* Dr. Beaumont's Answers to Plaintiff's Interrogatory No. 9, at **Exhibit 4**.  He explained to Dr. Severin his feelings that the physician-patient was becoming increasingly personalized, that Ms. Jacques was developing romantic feelings towards him, and Ms. Jacques' expectations for treatment were not realistic. *Id.* He further explained that Ms. Jacques often came to the clinic asking to be seen without an appointment, seemed to expect that Dr. Beaumont would treat her and no one else, and began attending the church that Dr. Beaumont attended with my family. *Id.* Dr. Beaumont told Dr. Severin that Ms. Jacques at one point asked him for a date. *Id.*   He further explained that Ms. Jacques had confronted Dr. Beaumont and his family at their church. *Id.*   Dr. Beaumont also expressed his concerns that Ms. Jacques was not adhering to his treatment plan and disregarding his numerous efforts and attempts to have her see a behavioral health professional for ongoing care either at Codman Square or elsewhere. *Id.* Indeed, Dr. Beaumont had referred Ms. Jacques to several counselors, but she did not keep those appointments,

and he shared these concerns with Dr. Severin, who assisted Dr. Beaumont with transferring Ms. Jacques' care to another provider. *Id.*

14.     Together Dr. Severin and Dr. Beaumont then spoke with Jo Ann Winbush regarding Dr. Beaumont's concerns and how the transfer would occur. *Id.*   In speaking with Ms. Winbush, Dr. Beaumont detailed his concerns about Ms. Jacques crossing personal boundaries, not following his treatment plan to see a behavioral health provider even after he made referrals, making appointments that he did not schedule, and getting too close to him. *See* Dr. Beaumont's Answer to Plaintiff's Interrogatory No. 10, at **Exhibit 4**.   Ms. Winbush told Dr. Beaumont that steps would be taken immediately to get the patient transferred to another provider. *Id.* Ms. Winbush also told Dr. Beaumont that she would make the necessary changes in the computer system, notify the secretaries, etc., and that Ms. Jacques should not be scheduled with him in the future. *Id.* Ms. Winbush made it explicitly clear that the patient would be transferred and that Dr. Beaumont would not see her again. *See* Beaumont deposition, **Exhibit 1** at 36:16-23. She reassured Dr. Beaumont that she would confer with her administrators and speak with the secretaries so that if Ms. Jacques called again to make an appointment with Dr. Beaumont it would not happen. *Id.* at 52:11-23.

15.     On November 24, 2008, Ms. Jacques called to make an appointment with Dr. Beaumont.   *See* Exhibit 4 to United States' and Codman's Joint Statement.   Dr. Beaumont informed Carmen Cruz in the Behavioral Health Unit about his concerns regarding Ms. Jacques' medical and overall management.   *Id.* He further informed Ms. Cruz that Ms. Jacques had often crossed boundaries, coming to the clinic without an appointment and asking to be seen, having the expectation that Dr. Beaumont will only

treat her, and talking to him at church. *Id.* Dr. Beaumont expressed concerns of safety for his family. *Id.* He also noted Ms. Jacques long history of attachment problems, often feeling abandoned and betrayed mostly by men, her history of troubled relationships, molestation and rape, PTSD, and anxiety disorder. *Id.* He recommended that she be transferred to another provider, preferably a female provider in another department. *Id.*

16.     Leading up to the transfer of Ms. Jacques' care there was a meeting with Ms. Jacques, Carmen Cruz, Jo Ann Winbush, and Dr. Severin to discuss the details of the transfer. *See* Dr. Beaumont's Answer to Plaintiff's Interrogatory No. 9, at **Exhibit 4**. Dr. Beaumont was called into the meeting after it began. Id. During the meeting, Ms. Jacques stated that she "loved [Dr. Beaumont]". *Id.* Ms. Winbush summarized why Ms. Jacques needed to be transferred to a new provider.  See Beaumont deposition, **Exhibit 1** at 46:2-7.  She indicated that Ms. Jacques was non-compliant and had developed personal feelings for Dr. Beaumont. Id. at 47:1-7. Dr. Beaumont stated that he was in agreement with the transfer and was then excused from the meeting. *Id.* at 46:2-7.  Following the meeting, Ms. Jacques care was transferred to the 2nd floor Internal Medicine department to see a different provider, Loretta Donald, NP. See Dr. Beaumont's Answer to Plaintiff's Interrogatory No. 9, at **Exhibit 4**.

17.     Carmen Cruz, a provider in the Behavioral Health department recalls Ms. Jacques' inappropriate behaviors in terms of her attraction to Dr. Beaumont, wanting to see him, and being obsessed with wanting to be with Dr. Beaumont. See Carmen Cruz deposition, **Exhibit 5** at 11:6-22.  She recalls telling Ms. Jacques that it was inappropriate to have a relationship with her doctor. *Id.* She further recalls bringing Ms.

Jacques' case to her supervisor's attention and explaining the inappropriateness of Ms. Jacques' fixation and obsession with Dr. Beaumont. *Id.* Ms. Cruz was told by her supervisor that Codman had taken steps to switch doctors and Ms. Jacques was no longer to see Dr. Beaumont for care. *Id.* After speaking with her supervisor Ms. Cruz understood that Ms. Jacques would not be allowed to see Dr. Beaumont for treatment anymore. *Id.* at 21:21-22:4.

18.   Ms. Cruz was concerned about Ms. Jacques thoughts regarding Dr. Beaumont. *Id.* at 19:13-15.  She knew based on her education, training and experience that providers treating patients like Ms. Jacques, with significant PTSD, needed to be more aware of potential boundary violations. *Id.* at 37:18-38:13.  She also believed that it was not the best treatment for a patient to receive mental health treatment from a primary care provider because a primary care provider does not have the proper training. *Id.* at 45:15-48:16.

19.   Dr. Severin has no memory of speaking with Dr. Beaumont regarding Ms. Jacques but from reviewing the medical record, which documents that Dr. Beaumont spoke with him, Dr. Severin believes Dr. Beaumont reached out to him about his concerns around the relationship with Ms. Jacques. See Severin deposition, **Exhibit 2** at 69:1-70:13.  Dr. Severin believes that it is probable that he then asked one of Codman's managers to step in to help with reassignment of Ms. Jacques to another provider. *Id.* Dr. Severin further believes that he would have worked with one of the managers to help process the situation. *Id.* at 70:9-21.  He believes there is a reasonable probability that he was involved with directing a manager to work with Dr. Beaumont, evaluate the situation, and make decisions on the next step. *Id.* at 71:1-12.

He would expect the manager to initiate follow-up to continue to work towards resolving the issue. *Id.* at 75:8-76:3. He would also expect the manager to assess the situation and try to resolve it. *Id.* at 78:3-18. Sometimes Dr. Severin would expect the manager to reassign a patient to a different provider. *Id.* at 80:7-13. On those occasions, he would expect the manager to follow through to take steps to make sure the patient did not continue to see the same provider. *Id.* at 80:7-23. Those steps would include reassigning the responsible provider in the electronic medical record, and creating some sort of note within the practice management system like an alert that would alert somebody trying to schedule an appointment so that an appointment would not be scheduled with the same provider. *Id.* at 81:1-19. Dr. Severin would further expect the manager to inform the caregivers involved so that they are aware of the situation. *Id.* at 81:20-82:5.

20.    According to Jo-Ann Winbush, Codman's then Manager for Patient Services, Ms. Jacques came to her office to report that she could not see the provider of her choice. *See* Jo-Ann Winbush deposition, **Exhibit 6** at 8:11-9:23. Ms. Jacques was very upset because she had been told by the staff that she could not see Dr. Beaumont that day and she asked Ms. Winbush to help her get an appointment somewhere else. *Id.* Ms. Winbush then scheduled Ms. Jacques to see a Nurse Practitioner, Loretta Donald. *Id.* The conversation lasted approximately 2 minutes and Ms. Winbush did not know why Ms. Jacques had been told she could not see Dr. Beaumont. *Id.* 10:14-11:15. She then called Dr. Beaumont into her office to speak with her and Ms. Jacques. *Id.* at 12:10-13:15. Dr. Beaumont explained that he had done everything within his professional scope to help Ms. Jacques and he wanted her to see another, more

experienced, provider. *Id.* Thereafter, Ms. Winbush did not discuss with anyone else why Ms. Jacques had been sent to her that day even though this was the first time a doctor had asked that a patient see another provider because he thought they could better treat the patient. *Id.* at 11:16-19, 21:22-22:2.

21.     After reassigning Ms. Jacques to Loretta Donald, Ms. Winbush understood that Ms. Jacques would now have a new primary care provider and that if she came back to Codman she would be seen by Loretta Donald. *Id.* at 27:6-13. Nonetheless, even after the reassignment, Ms. Winbush expected that if Ms. Jacques asked for an appointment with Dr. Beaumont, she would be scheduled to see Dr. Beaumont. *Id.* at 27:24-31:24. She understood that there would not be anything in place to alert the schedulers not to schedule Ms. Jacques with Dr. Beaumont. *Id.* Ms. Winbush did not put anything in place to prevent schedulers from scheduling Ms. Jacques to see Dr. Beaumont. *Id.* She did not put anything in the computer system to raise a red flag because there was no reason to raise a red flag. Id. In fact, following the meeting with Dr. Beaumont and Ms. Jacques, the only thing Ms. Winbush did was to schedule Ms. Jacques to see Loretta Donald and tell Dr. Beaumont to speak to Dr. Severin. *Id.* at 50:16-51:1. She took no steps to verify that Dr. Beaumont spoke with Dr. Severin. Id. at 45:6-8. She never alerted the staff who had sent Ms. Jacques to her that day that Ms. Jacques should not be further scheduled with Dr. Beaumont. *Id.* at 86:8-87:5. Ms. Winbush did not ask the clinical unit or the schedulers to alert her if Ms. Jacques tried to schedule an appointment with Dr. Beaumont. *Id.*

22.     Jesula Cantave was Dr. Beaumont's Medical Assistant at Codman. She recalls that when Codman transferred a patient's care to a new doctor someone would

tell the secretaries who schedule appointments not to book the patient with the former doctor. See Jesula Cantave deposition, **Exhibit 7** at 15:1-16:22. The secretaries then put a note in the chart to alert schedulers not to book an appointment with the former doctor. *Id.*

23.     Maria Charlesman was a secretary at Codman.  She testified at her deposition that in 2008 there was simply no system in place at Codman Square to alert schedulers not to schedule a specific patient with a specific doctor.  *See* Maria Charlesman deposition, **Exhibit 8** at 23:6-15.  Ms. Charlesman also recalls that she was told by her supervisor not to schedule Ms. Jacques with Dr. Beaumont.  *Id.* at 24:13-18.  She did not make a note of the instruction and does not recall alerting the other secretaries. *Id.* at 29:6-14.

24.     Sandra Cotterell was Codman's Chief Operating Officer.  She testified as a Rule 30(b)(6) witness for Codman Square.  Ms. Cotterell testified that, while Codman currently has a computer system in place that allows users to insert pop-up alerts to notify schedulers not to schedule a patient with a particular doctor, that system was likely not in place until 2009.  *See* Sandra Cotterell deposition, **Exhibit 9** at 21:1-23:8. Prior to the pop-up system being installed, Codman relied upon oral communication to ensure that a patient was not scheduled with a particular doctor.  *Id.*  Codman did not send emails or memos regarding scheduling specific patients.  *Id.*  A specific manager or director would execute the communication.  *Id.* at 27:2-5.  Codman expected the manager to make sure that was done.  *Id.* at 27:16-28:10.  Ms. Cotterell agreed that it would be challenging in a busy practice, where patients are calling and walking in all the

time, to recall that a specific patient should not be seen by a specific provider. *Id*. at 28:24-29:11.

25.     After the November 24, 2008, transfer of Ms. Jacques care to another provider, she nonetheless saw Dr. Beaumont again for medical care only six months later on March 12, 2009, when Ms. Jacques came to Codman for an Urgent Care visit. *See* Exhibit 3 to the United States' and Codman's Joint Statement.

26.     Ms. Jacques was scheduled to see Dr. Beaumont again on April 23, 2009. Id. Ms. Jacques had called Codman and asked to be seen by Dr. Beaumont. *See* Beaumont deposition, **Exhibit 1** at 67:9-21. Dr. Beaumont did not have any input into whether she would be allowed to see him, and he was surprised to see her. *Id*. at 68:1-70:21. Prior to the visit he expressed his immediate concern to his medical assistant and went to speak with Ms. Winbush to inform her that he was very unhappy that Ms. Jacques was allowed to make an appointment with him even after she had reassured him that it would not happen. *Id*. at 68:18-71:11. Ms. Winbush told Dr. Beaumont "Well, you know, Dr. Beaumont, anyone can book appointments in the building. It's not—you know, patients have rights, if they want to see someone, they can." *See* Winbush deposition, **Exhibit 6** at 56:12-21. Thereafter, Ms. Winbush did not put anything in Ms. Jacques file to indicate that she should not see Dr. Beaumont. *Id*. at 61:1-18. Ms. Winbush understood that Dr. Beaumont was concerned that Ms. Jacques had been scheduled with him, but she did nothing to follow up on the issue because it was not unusual at Codman that a patient gets on a doctor's schedule that they are not supposed to be on. *Id*. at 64:16-65:10. Ms. Winbush did not take any steps to prevent Ms. Jacques from scheduling another appointment with Dr. Beaumont. *Id*.

27.     After the transfer of care in November 2008, Ms. Jacques saw Loretta Donald, N.P., (who worked in the Internal Medicine Department), only once and then transferred herself back to the Family Medicine Department where Dr. Beaumont worked. *See* Beaumont deposition, **Exhibit 1** at 75:20-76:8. At that time she was treated by Family Medicine Residents. *Id.* Additionally, although Dr. Beaumont was not providing Ms. Jacques care over this period, Ms. Jacques had access to Dr. Beaumont's pager and paged him numerous times to express her displeasure with the Residents' care. *Id.* at 76:10-15.

28.     In February or March 2010, Dr. Beaumont visited Ms. Jacques at her home to see how she was doing. *Id.* at 80:12-81:7. He knew that she was dissatisfied with the care she was receiving at Codman and had lots of questions. *Id.* Dr. Beaumont visited Ms. Jacques home several more times between February and May 2010. *Id.* at 83:4-8. In May 2010, Dr. Beaumont and Ms. Jacques began a sexual relationship. *Id.* at 84:4-5.

29.     Thereafter, Ms. Jacques called Codman and made an appointment to be seen by Dr. Beaumont. *Id.* at 86:9-23. No one spoke with Dr. Beaumont about scheduling the appointment with him. *Id.* No one asked for his approval. *Id.* Dr. Beaumont did not know about the visit until the day it happened. *Id.*

30.     On May 27, 2010, Dr. Beaumont saw Ms. Jacques at Codman for medical care. *Id.* at 85:12-23. He inserted an IUD at Ms. Jacques' request. *Id.*

31.     Dr. Beaumont saw Ms. Jacques again for medical care at Codman in October 2010. *See* Beaumont deposition, **Exhibit 1** at 101:6-21. He had no role in

making the appointment and first learned he would be seeing Ms. Jacques when he walked into the exam room. *Id.*

32.  Ms. Jacques had three medical visits with Dr. Beaumont in 2011. *See* Exhibit 3 to the United States' and Codman's Joint Statement. Some of those visits included mental health counseling. *Id.* at 108:8-112:9, 116:20-117:1.

33.  Over the period from May 2010 through April 2011, Dr. Beaumont and Ms. Jacques continued their sexual relationship and had sexual relations at Codman. *See* Dr. Beaumont's Answer to the United States' Interrogatory No. 2, at **Exhibit 10**.

34.  According to Ms. Jacques, during the period of their sexual relationship, Dr. Beaumont continued to counsel her both at the office and outside the office. *See* Plaintiff's Answer to the United States' Interrogatory No. 2, at **Exhibit 11**. According to Ms. Jacques, Dr. Beaumont asked her to write him a letter describing her history, including her abuse history. *Id.*

35.  In April 2011, Ms. Jacques became pregnant with Dr. Beaumont's child. Id. They discussed an abortion and Ms. Jacques later learned that the pregnancy was ectopic and it was terminated. *Id.* Thereafter, Dr. Beaumont and Ms. Jacques ended their relationship and Ms. Jacques entered inpatient psychiatric care at Beth Israel Deaconess Medical Center followed by outpatient care. *Id.*

36.  Ms. Jacques claims in this lawsuit that as a result of the defendants' allegedly negligent conduct she became devastated to the point where she became sick, suffered headaches, stomach pain, and insomnia, lost self-respect and ambition, and engaged in reckless behavior including excessive drinking. Plaintiff's Answer to the United States' Interrogatory Nos. 7 and 13, at **Exhibit 11**.

The Defendant,
Mark Beaumont, M.D.,
By his attorneys,


George E. Wakeman, Jr., BBO #512230
Brooks L. Glahn, BBO# 648308
Adler│Cohen│Harvey│Wakeman│Guekguezian, LLP
75 Federal Street, 10th Floor
Boston, MA 02110
(617) 423-6674
gwakeman@adlercohen.com
bglahn@adlercohen.com


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document will be served electronically to the attorney of

record for each party via the ECF system.


Brooks L. Glahn

Dated: June 19, 2014