UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| YANICK JACQUES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-10520-DJC |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

REPLY MORANDUM OF UNITED STATES
IN SUPPORT MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

The arguments of the plaintiff and the defendant Mark Beaumont in opposition to the

United States' motion for summary judgment are clever but unavailing.  They ignore critical and

undisputed facts.  First and foremost, Dr. Beaumont did not begin his sexual relationship with the

plaintiff until approximately 18 months after he had ceased counseling her, and 13 months after

he had stopped providing medical care to her.  No reasonably jury could conclude that Dr.

Beaumont's counseling in 2008, or the failure to prevent an urgent care visit in March 2009[1] or

an office visit in April 2009[2] – when Dr. Beaumont had no romantic feelings toward the plaintiff

and no unprofessional conduct occurred – were a proximate cause of the injuries she claims

resulted from a sexual relationship that began in May 2010.  Second, Dr. Beaumont's request in

November 2008 that plaintiff's care be transferred to another provider, and the efforts of Dr.

Severin and Ms. Winbush to accomplish the transfer, did not arise out of a foreseen or

foreseeable risk of harm to the plaintiff from sexual misconduct; rather, they arose out of a

perceived need to protect Dr. Beaumont's personal privacy, help restore the plaintiff's lack of

---

[1]  *See* Joint SOF ¶¶ 12-13.
[2]  *See* Joint SOF ¶ 14.

boundaries, and provide the plaintiff with continuity in her medical care.  The plaintiff and Dr. Beaumont's effort to manufacture a foreseeable risk of harm in this situation is unsupported.

The plaintiff's attempt to establish a violation of a standard of care for medical instruction and supervision is also untenable.  Plaintiff's argument, when stripped of its rhetoric, is that, in the context of family medicine, when a patient with psychiatric symptoms violates boundaries and the provider responds by requesting that the patient's care be transferred to another provider, and when there are no suspicions or facts to suggest the physician may violate boundaries, the institution must nonetheless (a) require the physician to undergo training regarding proper counseling of mentally ill patients, (b) monitor the physician's appointments to ensure that the physician does not treat the patient again, and (c) strictly implement fail-safe protocols that ensure the patient does not schedule an appointment with the physician.  Such a standard of care is impractical and inappropriate.

Finally, the expert opinions proffered by plaintiff should be disregarded, as they are inadmissible under basic *Daubert* principles.

<u>ARGUMENT</u>

I.     PLAINTIFF'S CLAIM THAT HER INJURIES RESULTED FROM NEGLIGENT
       COUNSELING BY DR. BEAUMONT IS WITHOUT FOUNDATION

The plaintiff's assertion that the United States and Codman have engaged in "creative framing" of the Complaint is ironic.  Now that discovery has established the absence of any facts that would forewarn a reasonable person that Dr. Beaumont might engage in sexual relations with the plaintiff, and that the sexual relations did not begin until over a year after Dr. Beaumont stopped treating the plaintiff – the plaintiff argues that the real focus of her complaint is that Dr. Beaumont was negligent in counseling the plaintiff.  Regardless of whether this new theory is within the scope of the complaint, it fails.  First, the plaintiff did not allege this as a basis for her

administrative claim to the Department of Health and Human Services.  *See* Declaration of Jill

Steinberg (attached as Exhibit A hereto).  Her new theory of recovery is therefore barred by 28

U.S.C. § 2675(a).  *See Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007)

(plaintiff's FTCA claim did not allege facts about a second theory of liability and that, as a

result, the agency was not on notice of the particular (potentially tortious) conduct); *Dynamic

Image Technologies, Inc. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000) (discussing the notice-

of-claim requirement under the FTCA).

Second, it simply cannot be that the court in *Petrell v. Shaw*, 453 Mass. 377, 902 N.E.2d

401 (2009), would have reached a different result if the plaintiff in that case had argued that the

church rector was negligent in his counseling of her by allowing himself to become emotionally

involved.  It is likewise fantasy to suggest that the court in *Worcester Ins. Co. v. Fells Acres Day

Sch., Inc.*, 408 Mass 393, 558 N.E.2d 958 (1990), would have decided that case differently if the

plaintiff had argued that the day care employees were negligent in their provision of day care by

allowing themselves to develop sexual attractions toward the children during the course of their

work.  Similarly, it is most unlikely that the "scope of employment" issue would have been

decided differently in *Andrews v. United States*, 732 F.2d 366, 370 (4th Cir. 1984), or *Bodin v.

United States*, 462 F.3d 481, 484-487 (5th Cir. 2006), if only the plaintiff had argued that the

therapist (*Andrews*) or psychiatrist (*Bodin*) was negligent in his counseling by continuing to

provide counseling to the plaintiff while he was developing his attraction to the plaintiff.  The

proximate cause of Ms. Jacques' alleged injuries in this case was her sexual relationship with Dr.

Beaumont, not the counseling that Dr. Beaumont provided to her in 2008.  Regardless, in

determining scope of employment, courts look to the sexual conduct, not the underlying or

preceding counseling.

The plaintiff relies principally on *Benavidez v. United States*, 177 F.3d 927, 929 (10th Cir. 1999), and *Simmons v. United States*, 805 F.2d 1363, 1368-71 (9th Cir. 1986). *Benavidez* rejected the government's argument that the sexual conduct constituted an assault and battery, taking it outside the waiver of sovereign immunity in the Federal Tort Claims Act. The court did not decide whether the counselor's conduct was a "medical . . . or related function," or was "within the scope of his . . . employment" within the meaning of 42 U.S.C. § 233(a). *See* 177 F.2d at 928 n.2. Furthermore, the court in *Benavidez* relied heavily on *Simmons*, which has been discredited. *See Thompson v. Everett Clinic*, 71 Wash.App. 548, 860 P.2d 1054, 1058 (1993). Additionally, neither of those courts considered Massachusetts law, which controls the "scope of employment" issue here. Sexual misconduct by a physician toward a patient is neither a "medical or related function" nor within the scope of employment, plain and simple.

A.     The Plaintiff's and Dr. Beaumont's Characterizations of the Facts
       Concerning Dr. Beaumont Are Myopic

As alluded to above, the plaintiff and Dr. Beaumont, fail to confront – indeed they make no mention of -- the most important undisputed facts in this case:

- Dr. Beaumont stopped providing regular care to Ms. Jacques as of November 24, 2008, when he requested that her care be transferred to another provider. Joint SOF ¶¶ 12-17.

- Ms. Jacques' two health care visits with Dr. Beaumont on March 12, 2009, and April 23, 2009, were mistakenly scheduled, and Dr. Beaumont did not provide any mental health counseling during those visits. *Id.* Dr. Beaumont had no romantic feelings toward Ms. Jacques at this time. *Id.* at ¶ 15. Dr. Beaumont did not see Ms. Jacques again in a professional capacity until May 27, 2010. *Id.* ¶ 17.[3]

---

[3]  The plaintiff denies various paragraphs of the Joint Statements of Fact concerning the relationship between Dr. Beaumont and Ms. Jacques during the period November 2008 and May 2010, and she supports her denial by asserting that "Dr. Beaumont would have Ms. Jacques call Codman to schedule a visit, during which time they would have sexual relations. Dr. Beaumont told Ms. Jacques that he would not make a record of their visits." The clear inference she seeks to convey is that sexual relations occurred at various times between November 2008 and May 2010. The United States and Codman have explained the absurdity of plaintiff's denials in a separate Joint Reply To Plaintiff's Response To the Joint Statement of Facts at ¶ 12. As

- Between the April 23, 2009, visit and the May 27, 2010, visit, the plaintiff saw other providers for her medical and mental health care, and Dr. Beaumont did not consider himself to be her doctor. *Id*. ¶¶ 16-18.

- In February or March 2010, Dr. Beaumont began visiting Ms. Jacques at her home, "to see how she was doing." He was having difficulties in his personal life. *Id.* ¶ 19. The visits grew more personal. *Id.* ¶ 21.

- Two or three weeks before the May 27, 2010, office visit, Dr. Beaumont and Ms. Jacques had their first sexual encounter, at her home. *Id.* ¶ 23. They had sexual relations at her home more than once before the May 27, 2010, office visit.

- The May 27, 2010, office visit occurred so that Dr. Beaumont could insert an IUD. It was a purely professional office visit. Dr. Beaumont did not counsel the plaintiff. *Id.* ¶ 24.

Instead of addressing these important facts, the plaintiff and Dr. Beaumont focus on facts that are immaterial, as well as misleading. The facts recited by the plaintiff concerning Dr. Beaumont are illustrative. In castigating Dr. Beaumont's lack of training, experience and knowledge regarding psychiatric counseling, the plaintiff fails to explain the relevance of this. She does not demonstrate or even assert that the average qualified family practitioner would be *expected* to have training, experience and knowledge in that field. Treatment of psychiatric illness is a specialized field of medicine which Dr. Beaumont did not practice.[4] There is no evidence that the counseling he did do – encouraging relaxation techniques, encouraging her to talk to a friend or family member to manage her anxiety, establishing a "contract for safety" – was negligently done or caused any harm. Similarly, the plaintiff points out that Dr. Beaumont

---

explained therein, the apparent contention that sexual relations occurred before May 2010 is flatly contradicted by the complaint, plaintiff's answers to interrogatories, and the unambiguous deposition testimony of the plaintiff and Dr. Beaumont.

[4] Plaintiff's expert Dr. Jerry Blaine does not opine that a family practitioner would be expected to have training and knowledge regarding psychiatric counseling.

diagnosed anxiety disorder, PTSD, and depression, and he prescribed medications for these symptoms; but the plaintiff does not claim that any of these actions was done negligently.

The evidence is undisputed that Dr. Beaumont recognized the limitations of his abilities and referred the plaintiff to Codman's Behavioral Health unit.  He referred the plaintiff to this unit multiple times, but for months she refused to make an appointment.[5]  The plaintiff is in no position to complain that Dr. Beaumont should have "insisted" that she see a trained counselor, when the evidence is clear that she firmly rejected his advice.  The plaintiff does not contend that Dr. Beaumont should have initiated proceedings to have her committed involuntarily to a psychiatric facility.  Of course, all of this is immaterial.  The record shows that the plaintiff received inpatient psychiatric care in August 2008, and started counseling and treatment with Codman Behavioral Health specialists upon her discharge beginning August 18, 2008 -- roughly 21 months before the sexual relationship began.  *See* Joint SOF, Ex. 3; *and see* Plf's SOF ¶ 22; Beaumont SOF Ex. 3 (record of 08/18/2008 visit).   The plaintiff does not allege that Dr. Beaumont's counseling caused her to be hospitalized.  How his limited counseling and unsuccessful referral efforts before August 2008 had anything to do with the sexual relationship that began in May 2010 is unexplained and left to conjecture.

The plaintiff and Dr. Beaumont place great emphasis on Dr. Beaumont's lack of understanding and training regarding the concepts of transference and counter-transference.  But the majority of courts have rejected the view, first espoused in *Simmons v. United States*, 805

---

[5]  The plaintiff's statement of facts repeatedly asserts that Dr. Beaumont did not make a "formal referral" to the Behavioral Health unit on various occasions, insinuating that he was negligent in this regard.  But plaintiff also acknowledges that Dr. Beaumont consistently included "BH referral" in his treatment plan, and that Dr. Beaumont did affirmatively refer her to Behavioral Health on January 18, 2008, January 25, 2008, June 12, 2008, and August 18, 2008.  Plf's SOF ¶¶ 11, 12, 20.  There is no evidence that any of the referrals expired.  There is no claim in the complaint or assertion by plaintiff's expert that Dr. Beaumont erred in his referral efforts.

F.2d 1363 (9th Cir. 1986), that mismanagement of these principles brings circumstances of

sexual misconduct within the scope of employment.  Common sense indicates that it does not

take training in transference and countertransference for a doctor to know that he should not have

sex with a mentally ill patient.  The Hippocratic Oath, the principles of which every doctor

should be familiar, includes the statement, "Whatever houses I enter, I will do so for the benefit

of the sick, refraining from all intentional wrongdoing and misconduct, particularly from sexual

involvement with persons of either gender, whether free or slave."  Steadman's Medical

Dictionary, 890-91 (28th ed. 2006).[6]  To point the finger at the alleged negligent failure to

appreciate or to provide training about "transference and counter-transference" elevates

semantics over substance and misses the forest for the trees.

II.     THERE IS NO COMPETENT EVIDENCE THAT DR. BEAUMONT'S CONDUCT
        WAS FORESEEABLE AND THAT DR. SEVERIN AND MS. WINBUSH OWED A
        DUTY TO TAKE AFFIRMATIVE STEPS TO PROTECT PLAINTIFF FROM HIS
        SEXUAL ADVANCES

        The plaintiff and Dr. Beaumont are unable to point to any evidence that would have put

Dr. Severin or Ms. Winbush on notice that Dr. Beaumont might pursue a sexual relationship with

Ms. Jacques.  Instead, they go to great lengths to describe the particulars of the efforts to transfer

Ms. Jacques' primary care from Dr. Beaumont to another provider, and the alleged inadequacies

of the Codman electronic scheduling system.  They argue that this evidence demonstrates that

Dr. Severin and Ms. Winbush in fact foresaw a risk of harm to Ms. Jacques.  Alternatively, they

argue that Dr. Severin voluntarily assumed a duty to protect the plaintiff and failed to fulfill that

---

[6]   *See also Andrews v. United States*, 732 F.2d at 367-68; *and see* Perspective From the Boston
University School of Medicine and Boston Medical Center, Boston, *"I Swear by Apollo" — On
Taking the Hippocratic Oath*, Howard Markel, M.D., Ph.D.   Available online at http://master-
server.ch/curriculum/downloads-10/downloads-13/files/the%20hippocratic%20oath.pdf (last
visited June 28, 2014).  Dr. Beaumont is a graduate of the Boston University School of
Medicine.  *See* Ex. 1 to Joint SOF.

duty with reasonable care.  These arguments have no basis in the record, and no support in the law.

The mere fact that Dr. Severin and Ms. Winbush made efforts to effectuate the transfer of Ms. Jacques' primary care to another provider does not show that they foresaw a risk of harm to Ms. Jacques.  It is obvious that the efforts to transfer the patient were made in order to protect Dr. Beaumont's privacy and to ensure continuity of care for Ms. Jacques, not to prevent Dr. Beaumont from engaging in sexual misconduct.  It was the plaintiff, not Dr. Beaumont, who displayed inappropriate romantic feelings.  Joint SOF ¶¶ 7, 9; *and see* Defendant Beaumont's SOF Ex. 5 (Cruz Deposition) at 57:7-23.  Dr. Beaumont was married and had children (*see* Joint SOF ¶ 19; Plf's Ex.5 (Beaumont) 81:24 – 82:14), and it was he, not the plaintiff, who expressed concern about protecting the privacy of family members.  Plf's Ex. 3 at 441.  It was Dr. Beaumont, not Ms. Jacques, who requested the transfer.  *Id*.  It was Dr. Beaumont who, when Ms. Jacques unexpectedly appeared for an office visit on April 23, 2009, expressed concerns to Ms. Winbush and secured her assurance that this would not happen again.  Joint SOF ¶ 14.  And Dr. Beaumont never said anything to anyone at Codman that raised a suspicion that he had romantic feelings toward Ms. Jacques, "because there weren't any."  Joint SOF ¶ 15; Plf's Ex. 5 (Beaumont) 73:13-17.  Dr. Severin and Ms. Winbush have each sworn that they had no suspicion that Dr. Beaumont might become involved in a sexual relationship with Ms. Jacques.  Joint SOF ¶¶ 46, 48.  To claim, in the face of these facts, that Dr. Severin and Ms. Winbush foresaw a risk that Dr. Beaumont would engage in sexual relations with the plaintiff, is pure invention.

The plaintiff relies on the expert opinion of Dr. Jerry Blaine to assert that the plaintiff's boundary violations and display of romantic feelings establishes that Dr. Beaumont's subsequent conduct was foreseeable.  As explained in Part III below, Dr. Blaine's opinions are inadmissible

under Fed. R. Ev. 702.  There is no basis in fact or logic for concluding that inappropriate conduct by a *patient* creates a foreseeable risk that the *doctor* will violate his Hippocratic Oath and engage in sexual relations with the patient.  Dr. Blaine's vague assertion to the contrary is unsupported by any facts, studies, empirical evidence, statement of experience, or logic.  It is unhelpful and inadmissible.

The plaintiff and Dr. Beaumont argue in the alternative that, when Dr. Severin and Ms. Winbush undertook to transfer plaintiff's care, they assumed a legal duty to do it with reasonable care.  Dr. Beaumont relies on the common law principle recognized in *Mullins v. Pine Manor College*, 389 Mass. 47, 52-53 (1983), and stated in the Restatement (Second) of Torts, § 323, that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."  *Id.*; *see also Thorson v. Mandell*, 402 Mass. 744, 748 (1988).

The simple flaw in this argument is that Dr. Severin and Ms. Winbush did not undertake to protect Ms. Jacques from the type of harm that occurred in this case.  They undertook to provide her with continuity of primary medical care.  The nature of that undertaking is vastly different than an undertaking to prevent sexual misconduct by an employee, and the two should not be confused.[7]

---

[7] *See Ogden v. Aspinwall*, 220 Mass. 100, 103, 107 N.E. 448, 449 (1915) ("to make out liability on the part of a defendant it is enough to prove that the probable consequence of his acts was that harm of the same general character as that which came to the plaintiff would come to persons who stood in the same general relation to the defendant as the plaintiff").

Moreover, section 323 of the Restatement (Second) of Torts indicates that its statement of law incorporates the concept of foreseeability via the requirement that the defendant "should recognize [the services] as necessary for the protection of the other's person." Foreseeability thus remains a necessary element. In *Mullins*, which involved a female college student who was abducted from her dormitory room at night and raped, the SJC held that the harm to the plaintiff was foreseeable. 389 Mass. at 54-55. In *Cottam v. CVS Pharmacy*, 436 Mass. 316 (2002), also cited by the plaintiff, the risk of harm (side effects from a prescription drug) was known to the defendant pharmacy.[8] *See generally Whittaker v. Saraceno*, 418 Mass. 196, 197, 635 N.E.2d 1185, 1186-87 (1994). The same cannot be said regarding Dr. Severin's or Ms. Winbush's knowledge of the risk of harm that the plaintiff alleges.

Finally, the legal principal invoked by the plaintiff and Dr. Beaumont is inapplicable, because here the alleged failure to exercise reasonable care did not "increase[] the risk of such harm," and the harm was not "suffered because of the other's reliance upon the undertaking." There is simply no meaningful connection between the delay in bringing about the transfer of care (from November 2008 to April 23, 2009) and the sexual relationship that began in May 2010; therefore the delay could not have "increased the risk of such harm." Further, there is no evidence that the plaintiff either relied on Dr. Severin's and Ms. Winbush's efforts (in fact, she disagreed with them) or that she suffered because of delay in effecting the transfer.

B.   Even If Dr. Severin and Ms. Winbush Had a Duty, They Fulfilled It, and
      Any  Failures Had No Causal Relationship To the Sexual Relationship

The United States does not dispute that, as of November 24, 2008, Dr. Beaumont, Dr. Severin, Ms. Winbush, and Ms. Jacques all understood that Ms. Jacques should cease seeing Dr.

---

[8] In *Thorson v. Mandell*, 402 Mass. 744 (1988), cited by Dr. Beaumont, the court held that the defendant did not assume any duty to the plaintiff and did not undertake to render any services to her which it should have recognized as necessary for her protection. 402 Mass. at 748.

Beaumont and see another primary care physician.  Nobody disputes that the transfer of care was imperfect, inasmuch as Ms. Jacques saw Dr. Beaumont for an urgent care visit on March 12, 2009, and saw him again at an office visit on April 23, 2009.  But there is also no genuine dispute that, after the April 23, 2009, visit, Ms. Jacques' primary care *was* transferred to another provider, and that Dr. Beaumont did not see her again in a professional capacity until May 27, 2010, weeks after the sexual relationship had begun.  There is nothing to suggest a causal connection between the March 12 and April 23, 2009, visits and the future sexual relationship. Dr. Beaumont testified, without contradiction, that he provided no counseling during the March 12 and April 23, 2009, visits, that he did not begin seeing the plaintiff at her home until early 2010, and that the sexual relationship began two or three weeks before the May 27, 2010, visit. Joint SOF ¶ 13-14, 18-19, 23.

Any argument that the office visits that took place on and after May 27, 2010, had any causal connection to the sexual relationship would be unsupported conjecture.  The sexual relationship began at Ms. Jacques' home two or three weeks before the May 27, 2010, visit.  The May 27 visit was purely professional.  Additionally, the evidence strongly indicates that the sexual relationship would have continued regardless of any post-May 2010 office visits.  The plaintiff and Dr. Beaumont had sexual relations multiple times at Ms. Jacques' home, in a park, in Dr. Beaumont's car, at a hotel, and at Boston Medical Center.  They had sexual relations at Codman in circumstances unrelated to any scheduled visit.  Thus, even if Codman staff had prevented Ms. Jacques from scheduling appointments with Dr. Beaumont after their first sexual encounter in May 2010, it is likely that the sexual relationship still would have continued.  Any other conclusion would be pure speculation.  *See Magee v. United States*, 121 F.3d 1 (1st Cir. 1997) (finding insufficient evidence for a trier of fact to conclude that the doctor's failure to

warn the patient of the effects of psychiatric medication, and enabling the patient in getting a

driver's license, caused the accident).[9]

III.    THE OPINIONS OF PLAINTIFF'S EXPERT DR. JERRY BLAINE
        ARE INADMISSIBLE AND SHOULD BE DISREGARDED

The plaintiff proffers the expert opinion of Dr. Jerry Blaine, an internal medicine

doctor.[10]  Dr. Blaine opines about the conduct of Dr. Beaumont, Dr. Severin, and Ms. Winbush,

generally asserting that Dr. Beaumont should not have counseled Ms. Jacques and that Dr.

Severin and Ms. Winbush should have prevented it the sexual relationship.  He implies and that

the sexual relationship was foreseeable, and that the harm resulting from the sexual relationship

was caused by Dr. Beaumont's counseling and the conduct of Dr. Severin and Ms. Winbush.  Dr.

Blaine's opinions ignore essential undisputed facts, and lack the foundations required for

admissibility under Rule 702 of the Federal Rules of Evidence.[11]

Federal Rule 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

---

[9]   *And see LaClair v. Silberline Mfg. Co., Inc.*, 379 Mass. 21, 31, 393 N.E.2d 867, 873 (1979)
(causation may not be left to the jury's conjecture).

[10]  Dr. Blaine fails to include a curriculum vitae with his affidavit.

[11]  Even if Dr. Blaine's opinions were admissible, they should be given little, if any weight.  The
United States requested that the plaintiff disclose any expert opinions in an interrogatory
propounded in September 2013.  The plaintiff declined to provide it.  *See* Plf's Ex. 3, Answer to
Interrogatory No. 18.  The United States has had no opportunity to examine Dr. Blaine under
oath.

The Supreme Court has held that this rule imposes a gate-keeping function on the trial judge to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999) (holding that *Daubert* applies not only to scientific testimony, but also to technical and other specialized expert testimony). To determine whether an expert's testimony is sufficiently reliable, the district court considers whether "the testimony is based on sufficient facts or data"; whether "the testimony is the product of reliable principles and methods"; and whether "the expert has reliably applied the principles and methods to the facts of the case." *Smith v. Jenkins*, 732 F.3d 51, 64 (1st Cir. 2013) (quoting Fed. R. Evid. 702); *see Daubert*, 509 U.S. at 592–94.

As explained in more detail below, Dr. Blaine's affidavit lacks any meaningful factual or logical foundation for his opinions. The affidavit is almost devoid of any chronology of facts, depriving the Court of any insight concerning the factual assumptions underlying his opinions. In addition, Dr. Blaine provides no medical support for his conclusions. A close analysis of his affidavit reveals its fallacies.

A.     Dr. Blaine's Opinions Regarding Dr. Beaumont

Dr. Blaine offers two opinions regarding Dr. Beaumont, first, that Dr. Beaumont should not have continued to provide counseling to Ms. Jacques, and second, that "[t]he foundation for the boundary violations that later occurred were put in place when Dr. Beaumont continued to provide counseling (therapy) for Ms. Jacques. His first conclusion, that Dr. Beaumont should have ceased providing counseling to Ms. Jacques, appears to be based solely on the fact that Dr. Beaumont was unqualified to provide counseling to a patient with Ms. Jacques' symptoms. Dr. Blaine acknowledges that the plaintiff declined to see a specialist in the Behavioral Health

department, but he appears to be unaware (or fails to acknowledge) that the counseling that Dr.

Beaumont provided during 2008 was limited to recommending relaxation techniques,

encouraging Ms. Jacques to get better supports (for instance, talking to a friend or family

member to address her anxiety), and having her agree to a "contract for safety." Dr. Blaine does

not mention any of these counseling therapies; he does not opine that these or any other

particular therapies that Dr. Beaumont employed were improper or harmful, or that Dr.

Beaumont performed them negligently. He merely asserts that Dr. Beaumont should have

refrained from counseling the patient altogether. (He also does not say when the counseling

should have ceased.) Apparently, Dr. Blaine believes that an internist must decline to provide

any counseling whatsoever to a patient with mental illness who refuses to see a specialist, even if

that means leaving the patient with no support whatsoever. He does not explain why this

nonsensical proposition is valid here. He offers no insight into why an internist should refrain

from recommending relaxation techniques, or encouraging better supports, or making a "contract

for safety."

Dr. Blaine does not offer an opinion (although at times he insinuates) that Dr. Beaumont

waited too long to request that her care be transferred after realizing that Ms. Jacques was

crossing boundaries. From aught that appears in the affidavit, Dr. Blaine is unaware that it was

in late 2008 that Dr. Beaumont perceived the nature of the patient-physician relationship was

changing and that Ms. Jacques was expressing romantic feelings toward Dr. Beaumont. Joint

SOF ¶ 7. No later than November 24, 2008, Dr. Beaumont asked that the plaintiff's care be

transferred to another provider; and after that he did not provide her with any counseling.[12]

---

[12]   Dr. Beaumont testified that he may have counselled Ms. Jacques in 2011, but this is
irrelevant. There is no suggestion that counseling in 2011 had any causal connection to the
sexual relationship.

Moreover, Ms. Jacques began seeing mental health professionals in Codman's Behavioral Health department in August 2008, and she received professional mental health counseling and psychiatric care nine times before the sexual relationship began in May 2010 (*see* Ex. 3 to Joint SOF; *and see* Plf's SOF ¶ 2).   Dr. Blaine makes no mention of these facts, and offers no suggestion about when Dr. Beaumont should have ceased providing therapy.

Dr. Blaine next offers the opinion that "[t]he foundation for the boundary violations that later occurred were put in place when Dr. Beaumont continued to provide counseling (therapy) for Ms. Jacques."  Similarly, at the end of his affidavit he suggests that Dr. Beaumont's continuing to provide counseling to Ms. Jacques was the cause of the sexual relationship that developed 18 months later.  Dr. Blaine's affidavit gives no explanation of the basis for his assertion, and no description of the facts that he has considered or relied upon in making it.  He appears unaware of, or chooses to ignore, the undisputed testimony of Dr. Beaumont that he had no romantic feelings during the time he counseled her in 2008, and that the romantic feelings developed approximately 15 months after his last counseling session with her, when in early 2010 Dr. Beaumont was having marital difficulties and began seeing Ms. Jacques at her home.[13]

Dr. Blaine's opinion on causation is unhelpful and inadmissible.[14]  Clearly the sexual relationship was the proximate cause of any injuries.  Dr. Blaine's effort to draw a causal

---

[13]   See Joint SOF ¶ 19.  This is corroborated by Ms. Jacques' testimony.  See Plf's Ex. 6 (Jacques) 30:17-25, 42:3-10.  Dr. Beaumont's last counseling session with Ms. Jacques was November 20, 2008.  Plf's SOF ¶ 30.

[14]   Dr. Blaine also says that Dr. Beaumont's failure to "insist" that she receive counseling from a behavioral health practitioner was a cause of her injuries.  Yet nowhere in Dr. Blaine's affidavit does he opine that Dr. Beaumont was negligent in failing to insist that Ms. Jacques see a behavioral health specialist.  To the extent such an opinion is incorporated in his cryptic opinion on causation, it is undeveloped and unsupported by any facts or discussion, and should be disregarded.  As noted above, Dr. Beaumont made several referrals; Ms. Jacques refused; then she began seeing behavioral health specialists in August 2008.

connection to far more remote conduct, separated by a substantial lapse of time, is not based on medicine but on conjecture.

In *General Elec. Co. v. Joiner*, 522 U.S. 136, 519 (1977), the Supreme Court, in addressing the admissibility of expert conclusions, stated:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*See also Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39, 48-49 (1st Cir. 2009. This ruling is instructive here.

### B.      Dr. Blaine's Opinions Concerning Foreseeability and Duty

In his affidavit, Dr. Blaine makes a veiled suggestion that the sexual relationship was "predictable" and foreseeable. He further offers the opinion that Dr. Severin and Ms. Winbush had "a duty" to take certain measures to prevent Dr. Beaumont from ever seeing Ms. Jacques. These opinions are unhelpful, unreliable, and consequently inadmissible.

To the extent Dr. Blaine opines that the sexual relationship was foreseeable, his opinion is unmoored from the facts of this case and unhelpful. It appears to be based exclusively on the fact that Ms. Jacques exhibited boundary violations and romantic feelings toward Dr. Beaumont in late 2008. (There are no other facts upon which it could be based.) In essence, Dr. Blaine suggests that whenever a patient with symptoms of mental illness exhibits such boundary violations, it is foreseeable that the internist will engage in sexual misconduct. Dr. Blaine offers no publications, studies, statistics, or other empirical evidence to support this view. There is nothing to indicate that his medical training or experience makes him a better judge of the foreseeability of Dr. Beaumont's conduct than the Court or a jury. In short, it is simple

conjecture, unreliable, and unhelpful.  *See Chadwick v. Wellpoint, Inc.*, 561 F.3d 38, 48 (1st Cir. 2009) (affirming exclusion of expert testimony about what certain individuals meant when they used certain words); *Ji v. Bose Corp*, 538 F. Supp. 2d 354, 359-60 (D. Mass. 2008) ("[the] bald, conclusory assertion that the ambiguity in the contract terms, to be decided by the jury as a matter of fact, is susceptible to a simple legal answer, will not go to the jury.").

Dr. Blaine's opinions that Dr. Severin and Ms. Winbush had a duty to protect the plaintiff are premised on his inadmissible suggestion that Dr. Beaumont's conduct was foreseeable.  As demonstrated in Part II above, there is simply no competent evidence to support a conclusion the Dr. Beaumont's sexual advances were foreseeable.  For this fundamental reason, Dr. Blaine's opinions about what should have been done are inadmissible.

C.      Opinions Regarding the "Standard of Care"

Dr. Blaine states his opinion that, upon learning that Ms. Jacques had violated boundaries, Dr. Severin should have (a) instructed Dr. Beaumont about transference and countertransference, (b) "referred Dr. Beaumont to an appropriate person for additional training" regarding these concepts, (c) "put in place a system to provide that he be alerted if there were any future attempts by the patient to see Dr. Beaumont at the Health Center," and (d) "anticipated that Ms. Jacques would persist in trying to see Dr. Beaumont." [15]

Dr. Blaine's assertion regarding the standard of care also fails to withstand analysis.  He says, in essence, that any time an internist perceives boundary violations by a patient, the doctor cannot be trusted to refrain from pursuing sexual relations with the patient.  Instead, institutional

---

[15]  Significantly, Dr. Blaine's opinion that "[i]t should have been anticipated that Ms. Jacques would persist in trying to see Dr. Beaumont" either reflects ignorance of the relevant facts or misses the point.  The conduct giving rise to the alleged injuries was not Ms. Jacques' trying to see Dr. Beaumont, it was Dr. Beaumont seeking out Ms. Jacques at her home and ultimately entering into a sexual relationship with her.  There is no evidence that Ms. Jacques tried to see Dr. Beaumont during the relevant time from April 23, 2009, to May 2010.

supervisors must instruct the internist about transference and countertransference, refer him for training on these subjects, and establish a monitoring system to notify the supervisor of any attempt to see the patient, even when there is no reason to suspect the provider might pursue a sexual relationship.  He offers no support for his assertion that such measures are "the standard of care" – no published or unpublished literature, no indication that such measures are actually followed by any medical institution, nothing.  (The Court can imagine the reaction of internists to such intrusive and insulting measures.)  Dr. Blaine simply offers his *ipse dixit*.  "Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point."  *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) (citing *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."). Additionally, Dr. Blaine's opinion that Dr. Severin "had a duty" to take certain measures is a legal opinion on which he has no expertise and which intrudes on the province of the Court.  *See Cottam*, 436 Mass. at 320, 764 N.E.2d 814 (2002) ("The existence of a duty is a question of law to be decided by the judge.").

//

//

//

//

//

//

CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for summary

judgment.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   /s/ *George B. Henderson, II*

George B. Henderson, II
Assistant U.S. Attorney
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3272
george.henderson2@usdoj.gov

Dated: July 2, 2014

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2014, the foregoing document filed through
the ECF system will be sent electronically to the registered participants as identified on
the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered
participants.

/s/ George B. Henderson, II
George B. Henderson, II