UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YANICK JACQUES,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Civ. Action No. 13-cv-10520 |

## MEMORANDUM AND ORDER

CASPER, J.  February 23, 2015

### I. Introduction

Plaintiff Yanick Jacques ("Jacques") brings this action against the United States of America, Mark Beaumont, M.D. ("Beaumont"), Philipp Severin III, M.D. ("Severin"), Jo-Ann Winbush ("Winbush") and the Codman Square Health Center, Inc. ("Codman") alleging negligence and seeking relief under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). The United States accepted the defense of Severin and Winbush along with the defense of Codman as to Severin and Winbush's acts pursuant to 28 U.S.C. § 2679. D. 14, 24. Codman now moves for summary judgment as to its liability for Beaumont's acts, D. 41, and the United States moves for summary judgment as to its liability for Severin and Winbush's acts and Codman's vicarious liability for those acts, D. 43. For the reasons stated below, the Court DENIES both motions.

1

## II.     Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the non-moving party must produce specific facts "sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). The Court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). However, the non-moving party cannot simply rely on conclusory allegations and improbable inferences. Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995).

## III.    Factual Background

Unless otherwise indicated, this summary is drawn from the United States and Codman's joint statement of material facts, D. 45, and Jacques's response thereto, D. 52. Jacques has a history of mental illness and has exhibited symptoms of post traumatic stress disorder. D. 52 (Pl.'s Stmnt. of Material Facts) at 11 ¶ 8. Beginning in October 2007, Beaumont was Jacques's primary care physician at Codman. D. 45 ¶ 2. Beaumont

determined that Jacques required specialized psychiatric care and, in January 2008, referred her to Codman's Behavioral Health department. Id. ¶ 3. Jacques refused and did not seek treatment from the Behavioral Heath department until August 2008, after she experienced a psychiatric crisis that required inpatient care. Id. ¶ 4; D. 52 at 12,13 ¶¶ 12, 22. Jacques also continued to receive counseling from Beaumont. D. 52 at 13-14 ¶¶ 23-30. From January 2008 through November 2008, Jacques saw Beaumont about twice a month. D. 45 ¶ 5. During many of those visits, Beaumont provided mental health counseling to Jacques and prescribed psychiatric drugs to her. Id. ¶ 6; D. 52 at 12 ¶ 10. Beaumont acknowledges that he had minimal training in psychiatric care and did not appreciate the concepts of transference and countertransference. D. 45 ¶ 1.

In late 2008, Beaumont became concerned that Jacques was developing romantic feelings towards him. Id. ¶ 7. On November 24, 2008, Jacques discussed her feelings with her mental health counselor at Codman who informed Jacques that she would be transferred to a different primary care provider. Id. ¶ 9. Winbush, then Codman's Manager for Patient Services, was informed of the transfer. Id. ¶ 10. Winbush told Jacques that she should not see Beaumont anymore, but Winbush did not communicate any such prohibition to the scheduling staff. D. 52 at 16 ¶ 39. Severin, Codman's medical director, was also made aware of Jacques's boundary issues. D. 45 ¶¶ 46-47.

Despite the transfer, Jacques saw Beaumont at several subsequent Codman visits. In March 2009, Jacques sought urgent care at Codman on a walk-in basis and Beaumont was, coincidentally, the doctor who treated her. Id. ¶ 12. Jacques made an appointment to see Beaumont on April 23, 2009. Id. ¶ 14. Although Beaumont expressed concern to Winbush, he saw Jacques after Winbush assured him that Jacques would be reassigned to

another provider. Id. Beaumont did not provide mental health counseling to Jacques at these visits. Id. ¶¶ 13-14. From the April 23, 2009 visit until May 27, 2010, Jacques saw other Codman providers a total of twelve times. Id. ¶ 16.

In early 2010, Beaumont began to visit Jacques at her home. Id. ¶ 19. Eventually the visits grew more personal and, in early May 2010, Beaumont and Jacques had sexual relations. Id. ¶¶ 22-23. They had more sexual encounters, all at Jacques's home, prior to May 27, 2010. Id. On that date, Jacques had a scheduled office visit with Beaumont to insert an IUD. Id. ¶ 24. Beaumont and Jacques's sexual relationship continued through the summer of 2010, taking place outside of Codman until August 2010 when they had sex at Codman, unrelated to a medical visit by Jacques with Beaumont. Id. ¶¶ 26, 28. At this point the parties differ as to the frequency and nature of their sexual encounters at Codman. Jacques asserts that she and Beaumont had sex at Codman during medical appointments at least twelve times. Id. ¶¶ 30-31; D. 52 ¶ 47. Beaumont emphasizes that their sexual encounters at Codman were limited to two, in August 2010 and April 2011, and were not connected to Beaumont's provision of medical care. D. 45 ¶ 32.

Jacques saw Beaumont in a medical capacity several more times. In October 2010, he treated her during a walk-in urgent care visit. Id. ¶ 34. There was another urgent care visit on February 2011 at which Jacques's IUD was removed. Id. ¶ 37. Two scheduled medical visits occurred in April 2011. Id. ¶ 38. At none of these visits did Jacques and Beaumont have sexual relations, but he did provide her with basic mental health counseling during the April appointments. Id.

Jacques alleges that in May 2011 she informed Beaumont that she was pregnant. D. 1 ¶ 16. He urged her to terminate the pregnancy and she resisted. Id. Without

4

informing Jacques, Beaumont allegedly prescribed a drug to induce an abortion. Id. ¶ 17. Jacques later learned that the pregnancy was likely ectopic and she would miscarry. Id. Jacques alleges that Beaumont, Severin and Winbush's conduct caused her to suffer personal, emotional and psychological injury. Id. ¶¶ 23, 27, 31, 35, 39, 43, 47, 51.

IV. **Procedural History**

On April 30, 2012, Jacques made an administrative claim under the FTCA alleging significant boundary violations by Beaumont and claiming physical and emotional injuries. D. 1-1. She also alleged negligence on the part of Winbush and Severin for failing to prevent her sexual relationship with Beaumont. Id. Jacques's administrative claim was denied. D. 1-2. She then commenced this action. D. 1. The United States accepted tender of defense on behalf of Winbush and Severin and on behalf of Codman as to its vicarious liability for Winbush and Severin's conduct. D. 14, 24. The United States did not accept the defense of Beaumont or Codman with respect to Beaumont's conduct. The United States and Codman now move for summary judgment. D. 41, 43. The Court held a hearing on the pending motions and took the matters under advisement. D. 65.

V. **Discussion**

    A. **Codman's liability for Beaumont's conduct**

The United States is immune from liability unless it consents to be sued. See Molzof v. United States, 502 U.S. 301, 304 (1992). The Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(a), provides such a waiver:

> The remedy against the United States provided by [the FTCA] . . ., for damage for personal injury . . . resulting from the performance of medical . . . or related functions, . . . by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or

5

> employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

The United States and Codman dispute that Jacques has demonstrated that her injuries resulted from the performance of medical functions and that Beaumont was acting within the scope of his employment. D. 44 at 8. As to the performance of a medical function, the United States and Codman argue that Beaumont ceased providing medical care to Jacques in April 2009, so he was not performing a medical function when the two began their sexual relationship in May 2010. Id. at 10. Moreover, their relationship started outside of Codman and progressed for two months before they had intimate relations at Codman. Id. at 10-11.

The United States and Codman further argue that Beaumont was acting outside the scope of his employment when he had sexual relations with Jacques. Id. at 11. For the purpose of the FTCA, the law of the state in which the conduct occurred governs whether that conduct was performed in the scope of the employee's employment. Bodin v. Vagshenian, 462 F.3d 481, 484 (5th Cir. 2006). The test under Massachusetts law to determine whether an employee's actions are within the scope of his employment is familiar: (1) whether the conduct is of the kind the employee is hired to perform; (2) whether the conduct occurred within authorized time and space limits; and (3) whether the conduct was motivated, at least in part, by a purpose to serve the employer. Wang Labs., Inc. v. Bus. Incentives, Inc., 398 Mass. 854, 859 (1986).

The Supreme Judicial Court has applied this test to sexual conduct in the workplace and has concluded that such conduct is outside the scope of employment. Petrell v. Shaw, 453 Mass. 377, 384 (2009) (holding church rector's sexual relationship

with parishioner whom he counseled was outside the scope of the rector's employment); Doe v. Purity Supreme, Inc., 422 Mass. 563, 568 (1996) (concluding assistant store manager's rape of fellow employee was outside scope of employment); Worcester Ins. Co. v. Fells Acres Day Sch., Inc., 408 Mass. 393, 404-405 (1990) (holding sexual abuse of children by day care providers outside scope of employment).

In assessing only Beaumont's sexual misconduct, the same conclusion is easily reached here. Beaumont was not hired to engage in sexual relations with Codman's patients, the sexual relationship began and progressed outside of Codman (even though at least two and as many of twelve or more of the encounters took place at Codman), and it is reasonable to conclude that Beaumont was motivated by his personal feelings and not by a desire to serve Codman.

Jacques, however, propounds a novel theory with respect to the proximate cause of her injuries: Beaumont's negligent counseling of Jacques led to the sexual relations that harmed her. D. 51 at 7. "[T]he alleged negligence is not simply the sexual act, rather it is the negligence that [led] to the sexual act, which occur[ed] during the performance of medical or related functions, committed within the scope of employment." Id. at 7-8.

Jacques alleges that Beaumont's counseling was negligent in several ways. First, Beaumont was negligent in attempting to provide counseling that he was not qualified to perform. Id. at 1. Second, Beaumont continued to counsel Jacques even after he determined that she should see a specialist. Id. Third, Beaumont failed to recognize and

7

appreciate the phenomena of transference and countertransference[1]  Id.  Jacques contends that "[a]ll of [her] injuries flow from these initial departures from the standard of care" and "[h]ad Dr. Beaumont acted in accordance with the standard of care with respect to these issues, Ms. Jacques would not have been harmed."  Id.

At the outset, it must be noted that Jacques did not assert this theory of liability in her administrative claim to the Department of Health and Human Services.  D. 1-1. Jacques's letter alleged that she "was the victim of significant boundary violations by her primary care provider, Mark Beaumont, MD."  Id. at 1.  The letter stated that Beaumont's negligence included failing to appreciate Jacques's and his own boundary violations; engaging in boundary violations with Jacques; engaging in sexual relations with Jacques; failing to appreciate the harm that would be caused by the boundary violations; prescribing medication without discussing it with Jacques; and failing to educate Jacques regarding the prescribed medication.  Id. at 2.  Nowhere on this lengthy list of transgressions does Jacques specifically allege that Beaumont was negligent in counseling her or continuing to counsel her.

A would-be plaintiff must pursue an administrative remedy prior to suing under the FTCA.  28 U.S.C. § 2675(a) (stating that "[a]n action shall not be instituted upon a

---

[1] "Transference is the term used by psychiatrists and psychologists to denote a patient's emotional reaction to a therapist and 'is generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past.'"  Simmons v. United States, 805 F.2d 1363, 1364 (9th Cir. 1986) (quoting Stedman's Medical Dictionary 1473 (5th Lawyers' ed. 1982)). "[C]ountertransference also often occurs and it is 'the analyst's transference (often unconscious) of his emotional needs and feelings toward the patient, with personal involvement to the detriment of the desired objective analyst-patient relationship.'" McNicholes v. Subotnik, 12 F.3d 105, 106 n.3 (8th Cir. 1993) (quoting Stedman's Medical Dictionary 364 (25th ed. 1990).

claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied"). Failure to do so will result in dismissal of the omitted claims. Ramírez-Carlo v. United States, 496 F.3d 41, 47 (1st Cir. 2007) (excluding malpractice claim where facts about failure to treat coronary condition were absent from administrative claim); Dynamic Image Tech. v. United States, 221 F.3d 34, 40 (1st Cir. 2000) (excluding claim of false arrest from complaint where facts concerning incident omitted from administrative complaint). The purpose of the administrative claim is to provide "due notice that the agency should investigate the possibility of particular (potentially tortious) conduct." Dynamic Image, 221 F.3d at 40.

Jacques's administrative claim, however, does pass muster. It alleges that Beaumont treated Jacques's mental health issues. D. 1-1 at 2. From the list of Beaumont's alleged negligent conduct, the United States was put on notice that Beaumont failed to appreciate both his own and his patient's boundary violations. Id. at 2. Unlike in Ramírez-Carlo and Dynamic Image, there was no incident or set of facts that Jacques omitted from her administrative complaint. The United States had notice, although impliedly in some respects, that it should investigate Jacques's asserted reasons for the alleged boundary violations.

Jacques primarily relies on two cases addressing circumstances in which a sexual relationship was precipitated by a therapeutic one. First, in Simmons v. United States, 805 F.2d 1363, 1364, 1369, 1370 (9th Cir. 1986), the court held that a health services counselor acted within the scope of his employment when he engaged a patient in a sexual relationship after encouraging the patient, during a counseling session, to "act on

9

her professed feelings of sexual attraction to him" because the sexual contact occurred in conjunction with "legitimate counseling activities" and it was "impossible to separate an abuse of transference from the treatment itself." Second, the court in Benavidez v. United States, 177 F.3d 927, 932 (10th Cir. 1999), concluded that a psychologist negligently used his therapeutic relationship to engage in a sexual relationship and in drug and alcohol abuse with his patient. Benavidez, however, did not consider whether the psychologist was acting within the scope of his employment, addressing only whether the patient had a claim for professional negligence or medical malpractice. Id. Simmons is also problematic because its holding, which applied Washington law, was subsequently discredited by a Washington court. Thompson v. Everett Clinic, 71 Wash. App. 548, 553 (1993) (rejecting argument that doctor's sexual assault of patient was within scope of employment because it was committed in conjunction with an authorized examination and stating that "a tort committed by an agent, even if committed while engaged in the employment of a principal, is not attributable to the principal if it emanated from a wholly personal motive of the agent and was done to gratify solely personal objectives or desires of the agent").

Another established view in the case law is that manipulating a counseling relationship to seduce a patient is outside the scope of the therapist's employment. See, e.g., Bodin, 462 F.3d at 486-87 (noting limitations of Benavidez and observing criticism that Simmons misapplied Washington law and instead concluding that doctor's inappropriate and unnecessary examinations of patients' genitalia during scheduled visits was outside the scope of employment because personal desire motivated the assaults); Andrews v. United States, 732 F.2d 366, 370 (4th Cir. 1984) (holding that counselor who

initiated sexual contact under the guise of treatment was not acting within the scope of employment); but see Doe v. Samaritan Counseling Ctr., 791 P.2d 344, 348 (Alaska 1990) (collecting cases on both sides of issue, including Simmons and Andrews, before agreeing with Simmons to conclude that "where tortious conduct arises out of and is reasonably incidental to the employee's legitimate work activities, the 'motivation to serve' [component of the scope of employment test] will have been satisfied" and holding that sexual conduct resulting from transference was "incidental" to therapy).

The limitation of Bodin and Andrews, however, is that neither case describes facts similar to those alleged here. The parties agree that Beaumont did not misuse his counseling relationship with Jacques to pursue her sexually, unlike the cases in which a counselor exploited the transference phenomenon. Indeed, their first sexual encounter took place nearly thirteen months after her care was transferred to another Codman provider. There is no evidence that, during his counseling relationship with her, Beaumont attempted to convince Jacques that sexual contact would aid her therapy.

None of the cases cited by the parties or uncovered by the Court discusses the theory asserted by Jacques that Beaumont acted within the scope of his employment when he negligently provided counseling to her and that the negligent counseling was the proximate cause of the sexual relationship, and thus the emotional and physical harm, that followed. Jacques acknowledges that "[t]here is no dispute that counseling patients was part of Dr. Beaumont's job." D. 51 at 9. It logically follows that the allegedly negligent counseling would, therefore, also be within the scope of Beaumont's employment. Similarly, counseling is in the realm of the performance of a medical function, bringing the alleged misconduct within the scope of the Federally Supported

11

Health Centers Assistance Act. 42 U.S.C. § 233(a). It is less certain, though, that any negligent counseling would foreseeably result in the harmful sexual relationship. The United States and Codman argue that causation here is too attenuated to support a finding of liability, especially because of the lapse in time between Beaumont's treatment of Jacques and the commencement of their sexual relationship. D. 59 at 1.

It is appropriate for the issue of causation in this case to be resolved by the jury. Questions of causation are generally reserved for the factfinder. See Putnam Res. v. Pateman, 958 F.2d 448, 460 (1st Cir. 1992) (noting that "[a]pplication of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder") (internal quotation omitted); W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on the Law of Torts 321 (5th ed. 1984) (stating that "proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case") (internal quotations and citations omitted). The Court cannot conclude at this juncture that Jacques's injuries were, as a matter of law, not the foreseeable result of the negligent counseling she alleges. See Litowsky v. Asco Power Techs., L.P., 4 F. Supp 3d 328, 329 (D. Mass. 2014) (stating that "'although causation is generally left to a jury to decide, it may be determined as a question of law where there is no set of facts that could support a conclusion that the plaintiff's injuries were within the scope of liability'") (quoting Leavitt v. Brockton Hosp., Inc., 454 Mass. 37, 44-45 (2009)).

Codman and the United States argue that the causation question need not reach the jury because the evidence upon which Jacques relies to support her theory – the

affidavit of expert Dr. Jerry Blaine -- should be disregarded. D. 59 at 12-18. "Federal Rule of Evidence 702 assigns to the district court 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Smith v. Jenkins, 732 F.3d 51, 64 (1st Cir. 2013) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)). "To determine whether an expert's testimony is sufficiently reliable, the district court considers whether 'the testimony is based on sufficient facts or data'; whether 'the testimony is the product of reliable principles and methods'; and whether 'the expert has reliably applied the principles and methods to the facts of the case.'" Id. (quoting Fed. R. Evid. 702).

The United States and Codman contend that Dr. Blaine provides no basis for his conclusions that "[t]he foundation for the boundary violations that later occurred were put in place when Dr. Beaumont continued to provide counseling (therapy) for Ms. Jacques," D. 52-2 at 2, and that, had Beaumont refused to counsel Jacques or insisted she see a behavioral health practitioner, "it is very unlikely that they would have developed feelings for each other or ever started a sexual relationship," id. at 4. Blaine explains, however, that training in transference teaches counselors to anticipate that a patient can develop strong feelings for the counselor and, in a case of countertransference, the counselor for the patient. Id. at 1-2. Such training also instructs that neither the counselor nor the patient can ever act on their feelings. Id. Beaumont admits that, prior to this litigation, he was unfamiliar with the concepts of transference and countertransference. D. 45 ¶ 1. With this basis for Dr. Blaine's opinions in mind, a jury

13

may consider Jacques's position, giving what weight, if any, they choose to Dr. Blaine's testimony.[2]

### B. Liability for Severin and Winbush's conduct

The United States argues that Severin and Winbush had no legal duty to prevent the sexual relationship between Beaumont and Jacques because it was not foreseeable that Beaumont might engage in a sexual relationship with Jacques. D. 44 at 16-19; Afarian v. Mass. Elec. Co., 449 Mass. 257, 262 (2007) (stating that duty to exercise reasonable care to avoid harm to others requires that "harm to another be recognizable or foreseeable").

The United States points to several uncontested facts supporting the conclusion that it was not reasonably foreseeable that Beaumont would have a sexual relationship with Jacques. Beaumont had no history of sexual contact with patients. D. 44 at 17. Beaumont had no romantic feelings towards Jacques at the time the issue of boundaries arose in November 2008. Id. The concern at that time was for Beaumont's privacy because Jacques had feelings for him. Id. Jacques's care was eventually transferred, albeit not entirely successfully, to another provider. Id. Beaumont's visits to Jacques's home were not known to Severin and Winbush. Id.

On the other hand, Severin and Winbush did take steps to prevent Jacques from being treated by Beaumont. Once Severin and Winbush assumed a duty, they were obligated to exercise reasonable care. Mullins v. Pine Manor Coll., 389 Mass. 47, 52

---

[2] The United States notes that Jacques did not timely disclose Dr. Blaine's expert opinion and it has not deposed Dr. Blaine. D. 59 at 12 n.11. The scheduling order in this case instructs the parties to "hold off on expert discovery until decision on summary judgment motion by the Government," D. 31, but if the parties seek to depose expert witnesses before trial, they may seek leave to do so in connection with the initial pretrial conference.

14

(1983) (stating that "[i]t is an established principle that a duty voluntarily assumed must be performed with due care"). Jacques points to Severin's own deposition testimony that, where boundary violations occur, not only should a patient be reassigned to another provider, but a flag should also be placed in the scheduling system to ensure the patient cannot make an appointment with the doctor for whom she has feelings. D. 51 at 12. Further, Dr. Blaine, in his affidavit, opines that it was foreseeable that Jacques would persist in trying to see Beaumont who, given his lack of training, would be vulnerable to Jacques's affections. D. 52-2 at 2-3. According to Dr. Blaine, a reasonable standard of care required Severin and Winbush to implement a system that prevented Beaumont from seeing Jacques. Id.

The United States characterizes the duty undertaken by Severin and Winbush, if any, as a duty to provide Jacques with "continuity of primary medical care," not the duty to prevent the harm that occurred as result of Jacques's sexual relationship with Beaumont. D. 59 at 9. Moreover, contends the United States, the imperfect transition of Jacques to a new provider did not increase the risk of a sexual relationship, nor did Jacques rely upon Severin and Winbush's efforts. Id. at 10. And even if Severin and Winbush had prevented Jacques from seeing Beaumont at Codman, it is likely their sexual relationship, which started and progressed outside of Codman, would have continued. Id. at 11.

The Court cannot conclude that there is "no rational view" warranting a finding of negligence. Mullins, 389 Mass. at 56 (writing that "[u]sually the question of negligence is one of fact for the jury. Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury") (internal

15

quotation marks omitted). Dr. Blaine's opinion that Severin and Winbush had a duty to protect Jacques from Beaumont's foreseeable advances is premised on his opinion that Beaumont's failure to understand transference and countertransference proximately caused Jacques's alleged harm. As discussed above, Dr. Blaine provides an explanation, albeit a brief one, of the basis for this opinion. Moreover, there is evidence to support the inferences asserted by both parties. The fact that Severin and Winbush ultimately transferred Jacques to another provider supports the inference that they effectively addressed the concern that Jacques would seek out Beaumont. But other evidence points to a duty to be more diligent in anticipating the risk of a sexual relationship between doctor and patient and to institute more effective measures to prevent the two from interacting. Whether the harm alleged here would have resulted had Severin and Winbush managed Jacques's transfer differently is a question of causation for the jury.

## VI. Conclusion

For the reasons set forth herein, the United States' motion for summary judgment, D. 43, is DENIED. Codman's motion for summary judgment, D. 41, is also DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge